Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DANIEL PALACIOS                    )
                                   )
VS.                                )  CIVIL ACTION NO.
                                   )     4:11-CV-03085
CONTINENTAL AIRLINES, INC.         )

ORAL AND VIDEOTAPED DEPOSITION OF

DANIEL PALACIOS

MAY 14, 2012

VOLUME 1 OF 1

ORAL DEPOSITION OF DANIEL PALACIOS, produced as a
witness, duly sworn by me at the instance of the
Defendant, taken in the above-styled and numbered cause
on May 14, 2012, from 9:59 a.m. to 2:55 p.m., before
Mylinda Tubbs Faircloth, Certified Shorthand Reporter
No. 2896 in and for the State of Texas, via machine
shorthand, at the Law Offices of Peter Costea, Three
Riverway, Suite 1800, Houston, Texas 77056, pursuant to
the Federal Rules of Civil Procedure and any provisions
stated on the record.

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 2

```
 1          A P P E A R A N C E S
 2   FOR THE PLAINTIFF
       Mr. Peter Costea
 3     Law Offices of Peter Costea
       Three Riverway, Suite 1800
 4     Houston, Texas 77056
       Telephone: (713) 337-4304
 5     Fax: (713) 659-5302
 6   FOR THE DEFENDANT
       Mr. Michael D. Mitchell
 7     Ogletree, Deakins, Nash, Smoak & Stewart
       500 Dallas Street, Suite 3000
 8     Houston, Texas 77002
       Telephone: (713) 655-5756
 9     Fax: (713) 655-0020
10   VIDEOGRAPHER
       Mr. Joe Mieczkowski
11     Mieczkowski Video Productions
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   Exhibit 15.....................144
        Employment Termination/Rebuttal Letter dated
 2      December 22, 2009
     Exhibit 16.....................146
 3      Facsimile Transmittal dated December 30, 2009 and
        Request for Appeal Form - Step 1
 4   Exhibit 17.....................170
        Memorandum
 5   Exhibit 18.....................173
        Appeal Procedure
 6   Exhibit 19.....................179
        Facsimile Transmittal dated January 28, 2010 and
 7      Request for Appeal Form - Step 2
     Exhibit 20.....................181
 8      Letter dated February 1, 2010
     Exhibit 21.....................182
 9      E-mail string - Subject: Step 2 Appeal
     Exhibit 22.....................184
10      Appeal Hearing Documentation
     Exhibit 23.....................187
11      2nd Level Appeal Hearing
     Exhibit 24.....................188
12      Letter dated February 11, 2010
     Exhibit 25.....................189
13      Facsimile Transmittal dated February 19, 2010 and
        Request for Appeal Form - Step 3
14   Exhibit 26.....................190
        Letter dated February 24, 2010
15   Exhibit 27.....................195
        Appeal Hearing Documentation
16   Exhibit 28.....................195
        3rd Level Appeal Hearing
17   Exhibit 29.....................196
        Letter dated March 3, 2010
18   Exhibit 30.....................197
        E-mail string - Subject: FedEx Shipment
19      798442876778 Delivered
     Exhibit 31.....................213
20      Claimant's Rebuttal to Respondent's Position
        Statement
21
22
23
24
25
```

Page 3

```
 1                INDEX
 2                            PAGE
     Appearances.....................2
 3
     Stipulations.....................4
 4
     DANIEL PALACIOS
 5      Examination by Mr. Mitchell.................4
     Correction and Signature Pages.............223
 6   Reporter's Certifications...............225
 7              EXHIBITS
 8   NO. DESCRIPTION            IDENTIFIED
 9   Exhibit 1.....................29
10      Plaintiff's Objections and Answers to the
        Defendant's First Set of Interrogatories
11   Exhibit 2.....................71
        Interoffice Memorandum dated January 19, 1995
12   Exhibit 3.....................74
        Typed note dated January 4, 1996
13   Exhibit 4.....................75
        Past Employee Verification and Application for
14      Employment
     Exhibit 5.....................76
15      Comments - Employee Status
     Exhibit 6.....................81
16      Ethics and Compliance Guidelines
     Exhibit 7.....................83
17      Working Together Guidelines
     Exhibit 8.....................85
18      Application for Employment
     Exhibit 9.....................95
19      Corporate Security Pre-Interview Questionnaire
     Exhibit 10.....................97
20      Personal Statement
     Exhibit 11.....................104
21      Charge of Discrimination
     Exhibit 12.....................106
22      Employment Termination/Rebuttal Letter dated
        January 5, 2010
23   Exhibit 13.....................118
        Statement of Findings
24   Exhibit 14.....................140
25      Letter dated December (18) 21, 2009
```

Page 5

```
 1          P R O C E E D I N G S
 2               MAY 14, 2012
 3          THE VIDEOGRAPHER:  Today's date is
 4   Monday, May 14th, 2012.  The time is approximately
 5   9:59 a.m.
 6          THE REPORTER:  Counsel, please state your
 7   stipulations for the record.
 8          MR. MITCHELL:  Just by the Rules.
 9          MR. COSTEA:  Yes, federal.
10               DANIEL PALACIOS,
11   having been first duly sworn, testified as follows:
12               EXAMINATION
13   BY MR. MITCHELL:
14     Q.  Mr. Palacios, my name is Mike Mitchell.  I'm
15   one of the attorneys that's representing Continental
16   Airlines in this lawsuit.
17          You and I have never met before, have we?
18     A.  No, we have not.
19     Q.  Okay.  You understand why you're here today?
20     A.  Yes.
21     Q.  Okay.  I - I see that you've got paper and
22   pen in front of you.  What are you doing there?
23     A.  I'm just writing names down.  It's something
24   that I do so I can remember things.
25     Q.  Okay.  You understand that you're here to give
```

2

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 6

1  a deposition today?
2      A.  Correct.
3      Q.  And you understand that the court reporter has
4  just sworn you in to tell the truth here?
5      A.  Correct.
6      Q.  Is there any reason you can give us today why
7  you would not be able to give truthful testimony?
8      A.  No.
9      Q.  Okay.  The way the deposition is going to work
10  is I'm going to ask you questions that I'll need you to
11  answer.  Do you understand that?
12      A.  Correct.
13      Q.  And you understand that, as I said, the court
14  reporter is taking down everything that's being said
15  here in the room?
16      A.  Right.
17      Q.  Okay.  In order for her to do that, you're
18  going to have to give verbal responses to my questions.
19  And so if you just shake your head or nod your head,
20  I'll say, I — I need an answer.  Do you understand
21  that?
22      A.  Right.
23      Q.  Okay.  Also, it's going to be important for us
24  not to talk over each other.  So I'm going to do my best
25  to let you finish answering my question before I start

Page 7

1  another one.  And why don't you let me finish asking my
2  question before you start answering, okay?
3      A.  Okay.
4      Q.  All right.  And I understand sometimes it
5  won't work out well.  We'll correct each other if we do,
6  okay?
7      A.  Okay.
8      Q.  All right.  Are you on any types of medication
9  today?
10      A.  No.
11      Q.  Okay.  Do you regularly take any medication?
12      A.  Yes.
13      Q.  What do you take?
14      A.  I don't know the name of the prescription, but
15  it's a cholesterol medicine.  And occasionally I take
16  Abilify.
17      Q.  Okay.  So you take a prescription for the
18  cholesterol?
19      A.  Right.
20      Q.  And occasionally Abilify?
21      A.  Yes.
22      Q.  Okay.  How often do you take the cholesterol
23  medicine?
24      A.  Every day.
25      Q.  And what time do you take it normally?

Page 8

1      A.  Well, the — sometimes I take it in the
2  morning, when — then I — when I forget, in the
3  afternoon; and when I forget, you know, before going to
4  bed.
5      Q.  Okay.  And do you know of any side effects
6  that that medicine — medication has on you?
7      A.  No.
8      Q.  Okay.  And then you said Abilify?
9      A.  Uh-huh.
10      Q.  What is Abilify?
11      A.  That is a medicine that helps me feel better,
12  I guess.
13      Q.  Okay.  Who prescribed that for you?  Is it a
14  prescription?
15      A.  Yes, it is.
16      Q.  And who prescribed it for you?
17      A.  Dr. Stockwell.
18      Q.  Stockwell?
19      A.  Uh-huh.
20      Q.  Okay.  What kind of doctor is he?
21      A.  He's a psychiatrist.
22      Q.  And how long have you been seeing
23  Dr. Stockwell?
24      A.  Two and a half years, maybe three.
25      Q.  So that would take us back sometime in 2009?

Page 9

1      A.  Possibly, yes.
2      Q.  Okay.  As far as the Abilify, did I
3  understand you to say you take it when you need it?
4      A.  I used to take it, like, every day.  And then
5  I'm -- I'm trying to -- to break away from it, if I -- I
6  can say that, you know, trying to minimize the use of
7  the medicine.
8      Q.  Okay.  And I -- I'm sorry.  I'm not familiar
9  with Abilify.  I assume that's a pill?
10      A.  It's a pill.
11      Q.  How many milligrams do you take of it?
12      A.  You know what?  I — I don't know.  I don't
13  remember.
14      Q.  That's okay.  And as far as the Abilify, when
15  did you first start taking it; do you recall?
16      A.  Right after I -- I -- I went to see him.  It
17  was in 2009.
18      Q.  Okay.  What — were you still employed by
19  Continental, or not?
20      A.  Yes, I was.  I was.  But before that, I'd been
21  taking a lot of medicines for the same reason until I
22  found this one that worked for me, and that's why I'm —
23  I'm still taking this medicine.
24      Q.  Okay.  And when you say you found that this
25  one works for you, what does it do for you?

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 10

1    A.  Well, it doesn't make me feel -- it makes me
2  feel, like, more like myself, you know, and not dazed
3  or, you know -- some of the medicines have a lot of side
4  effects.  One of them is not being able to sleep or
5  other ones that give you -- you know, they knock you out
6  or other ones that make you feel funny.
7    Q.  Okay.  And this one doesn't have any side
8  effects that you know of?
9    A.  It has side effects, but they're very minimum.
10    Q.  Okay.  What kind of side effects do you feel
11  from it?
12    A.  You know, just like that we're here talking,
13  and then all of a sudden, I just -- you know, I start
14  looking at that sign over there for a minute, and then I
15  just come back to.
16    Q.  Okay.  So, what, you get distracted or
17  something?
18    A.  Yeah, but it's really minimal, not -- it's not
19  as bad as the other ones.
20    Q.  Okay.  And when is the last time you took an
21  Abilify?
22    A.  Yesterday or two days ago.
23    Q.  Okay.  Do you -- do you recall which one it
24  was, Saturday or Sunday?
25    A.  Yesterday was Sunday.  Sunday, I believe.

Page 11

1  Sunday morning.
2    Q.  Okay.  Yesterday morning?  And you just took
3  one pill?
4    A.  Yeah.
5    Q.  Okay.
6    A.  Let me correct that.  It was half of that
7  pill, since I'm trying to...
8    Q.  Okay.  Besides the Abilify and the cholesterol
9  medicine, is there any other medicine you're taking?
10    A.  Baby aspirin.  I don't take (unintelligible.)
11    Q.  How often do you take --
12        COURT REPORTER:  I'm sorry.  You don't
13  take what?
14        THE WITNESS:  Baby aspirin.
15        COURT REPORTER:  You're kind of trailing
16  off on me.  I need you to keep your voice up for me.
17    Q.  (By Mr. Mitchell)  Okay.  How often do you
18  take the baby aspirin?
19    A.  Every day.
20    Q.  And what do you take it for?
21    A.  Heart.
22    Q.  Okay.  Is that something a doctor told you to
23  do?
24    A.  Right.
25    Q.  All right.  So baby aspirin, Abilify and

Page 12

1  cholesterol medicine.  That's it?
2    A.  (Moving head up and down.)
3    Q.  You --
4    A.  Yes --
5    Q.  -- have to answer --
6    A.  -- that's it.
7    Q.  Okay.  You see, Mylinda will get on to us if
8  we don't do it.
9        Okay.  What's your date of birth?
10    A.  8/22/1968.
11    Q.  So you'll turn 44 this year?
12    A.  Yes.
13    Q.  And you have a Social Security number?
14    A.  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.
15    Q.  What about, do you drive?
16    A.  I drive, yes.
17    Q.  Do you have a Texas driver's license?
18    A.  Yes, I do.
19    Q.  Do you know the number on it?
20    A.  I don't.
21    Q.  Okay.  How long have you had it?
22    A.  Since I was 17, 18.
23    Q.  Were you born here in Houston?
24    A.  I was actually born in Mexico.
25    Q.  Okay.  What part?

Page 13

1    A.  Matamoros.
2    Q.  And when did you come to Texas?
3    A.  When I was 14 -- 13, 14.
4    Q.  And so prior to 13 or 14, was all your
5  schooling done in --
6    A.  Mexico.
7    Q.  -- Mexico?
8    A.  Yes.
9    Q.  Okay.  Do you consider yourself fluent in
10  English?
11    A.  Yes.
12    Q.  Able to read and write proficiently?
13    A.  Correct.
14    Q.  Okay.  I understand you did graduate high
15  school in Texas, correct?
16    A.  Right.
17    Q.  And when was that?
18    A.  1988.
19    Q.  And what high school was it?
20    A.  Sam Houston High School.
21    Q.  Where is it located?
22    A.  On Irvington and Tidwell, between 40 -- I-45
23  and Hardy Toll Road.
24    Q.  Okay.  Do you know, is the school still there
25  now?

4

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 18

1    -- one system.
2        Q.  I see.  Okay.  And you said you attended that
3    at the end of February through the end of March?
4        A.  Right.
5        Q.  So was that a four-week course, as well?
6        A.  Yes, close to that.
7        Q.  Okay.  And how often did you have to go to
8    that course?
9        A.  I went twice a week.  On Thursdays, I -- I
10   used to go four hours, and then on Saturdays it was ten
11   hours.
12       Q.  Ten hours?
13       A.  Yes.  And then I used to do homework, a lot of
14   homework, at home.
15       Q.  How much homework would you have to do?
16       A.  In hours, I want to say, like, four or five
17   hours.
18       Q.  Every day?
19       A.  Uh-huh.
20       Q.  Is that a "yes"?
21       A.  Yes.
22       Q.  I'm sorry.  Okay.  And so that would be -- are
23   you saying four or five hours five days a week, six days
24   a week?
25       A.  Five days a week.

Page 19

1        Q.  Okay.  So about 25 hours a week of homework?
2        A.  Yes.
3        Q.  Okay.  All right.  So we have your high
4    school, your HCC, the SAP, and the mediating and
5    arbitrating course.  Any other schooling?
6        A.  No.
7        Q.  Okay.  Where do you currently live?
8        A.  2824 Cetti Street, Houston, Texas 77009.
9        Q.  Is Cetti C-E-T-T-I?
10       A.  C-E-T-T-I.
11       Q.  Okay.  Is that a house or an apartment?
12       A.  It's a house.
13       Q.  Are you buying it?
14       A.  No.  I'm -- I'm -- I'm renting it.
15       Q.  How long have you been at that address?
16       A.  Two and a half years, possibly three.
17       Q.  When you were at -- at Continental Airlines,
18   were you living at the Cetti Street address?
19       A.  No.
20       Q.  Okay.  So my understanding is you left
21   Continental in December of 2009; is that right?
22       A.  Correct.
23       Q.  And so when do you think you moved into the
24   Cetti Street house?
25       A.  2010, right after I -- I -- I left

Page 20

1    Continental.
2        Q.  So maybe January or so of 2010?
3        A.  Yeah.  Possibly, yeah.
4        Q.  And who lives in the Cetti Street house with
5    you?
6        A.  My fiance.
7        Q.  What's her name?
8        A.  Sandra Somoza, S-O-M-O-Z-A.
9        Q.  Okay.  I -- I thought -- I was under the
10   impression you had married her.  You-all are not
11   married?
12       A.  We have a marriage license.
13       Q.  Okay.  When did you get that?
14       A.  In 2009, summer 2009.
15       Q.  And so why haven't you gotten married over the
16   past two and a half years?
17       A.  We actually -- I mean, we've been discussing,
18   you know, getting married.  And -- and we just have to
19   save money for that.
20       Q.  Okay.
21       A.  That's why I said fiance, because we're not --
22   you know...
23       Q.  I understand.  And what is your rent there at
24   the Cetti Street house?
25       A.  It's six -- we pay, like, 675, I believe.

Page 21

1        Q.  Per month?
2        A.  Yes, per month.
3        Q.  Okay.  Has anybody lived there besides
4    yourself and Sandra Somoza?
5        A.  No.
6        Q.  Okay.  And as far as paying the monthly rent
7    on the house, how is that paid?
8        A.  By check.
9        Q.  I mean, do you pay it?  Does she pay it?  How
10   do you --
11       A.  We both pay it.  Well, she pays it, yeah.
12       Q.  Okay.  Is it both of you or just her?
13       A.  Both of us.
14       Q.  Okay.  I understand you have been married
15   before; is that right?
16       A.  Right.
17       Q.  And who were you married to?
18       A.  Well, I was married to Anita Palacios.
19       Q.  Okay.  And how long were y'all married?
20       A.  I want to say four or five years.
21       Q.  Do you recall when it was that you got
22   married?
23       A.  No.  I apologize.  I don't.
24       Q.  That's okay.  Were you and Ms. Anita Palacios
25   married during the time you worked at Continental?

6

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

## Page 22

1   A.  Yes.
2   Q.  Okay.  But by the time you left Continental in
3   December of 2009, you and Ms. Anita Palacios –
4   A.  We were divorced.
5   Q.  – were divorced?
6   A.  Yes.
7   Q.  Do you recall when the divorce took place?
8   A.  It was in November of 2006, I believe.
9   Q.  Okay.  And so you would have been married
10  around 2001, 2002, or so?
11  A.  I want to say 2001, yes.
12  Q.  Okay.
13  A.  Close to that.
14  Q.  And do you have children?
15  A.  I have my daughter, yes.  My daughter.
16  Q.  One daughter?
17  A.  Uh-huh.
18  Q.  What's her name?
19  A.  Victoria Palacios.
20  Q.  And how old is Victoria?
21  A.  She is 13.
22  Q.  And I'm assuming that Victoria lives with
23  Ms. Anita Palacios?
24  A.  Yes.
25  Q.  Do you pay child support?

## Page 23

1   A.  I pay child support, yes.
2   Q.  And how long have you been paying child
3   support?
4   A.  Ever since we got divorced, since 2006.
5   Q.  Okay.  And how much per month do you pay
6   there?
7   A.  It's 256, I believe, every two weeks.
8   Q.  So about 512 a month?
9   A.  Yeah.
10  Q.  And do you also have a son?
11  A.  I have – I have two kids, yes, but that was
12  from a previous marriage.
13  Q.  Okay.  And so Victoria is the mother – I'm
14  sorry, is the daughter of Anita?
15  A.  Right.
16  Q.  All right.  Who is the other wife you had?
17  A.  Amabely, or Amy, A-M-Y, Palacios.
18  Q.  And how long were you and Amy married?
19  A.  Nine years.
20  Q.  Do you recall what years those were?
21  A.  Between – we got married in eighty – '89.
22  We got divorced in '97, '98.
23  Q.  And what is your son's name from Amy?
24  A.  The oldest, it's Ivan Palacios.  He's 24, I –
25  24, I think.  And Brandon, he just turned 18, Brandon

## Page 24

1   Palacios.
2   Q.  Okay.  And does Brandon live with Amy?
3   A.  Yes, he does.
4   Q.  Where do they live?
5   A.  They live in Spring, Texas.
6   Q.  In Spring?
7   A.  In Spring, yes.
8   Q.  Okay.  And were you having to pay child
9   support for Brandon, as well?
10  A.  Yes.
11  Q.  How much was that?
12  A.  275 every two weeks.
13  Q.  Okay.  And so you have a total of three
14  children; is that right?
15  A.  Correct.
16  Q.  All right.  Does the child support for Brandon
17  cut off now that he's 18?
18  A.  Actually, it will be cut off as soon as he
19  finishes his school, which is pretty soon.  Next month,
20  I believe.  Yeah, next month.
21  Q.  Okay.  I understand that, besides this
22  lawsuit, you've been involved in a car accident lawsuit;
23  is that right?
24  A.  Yeah.  That – that was about a year and a
25  half ago.

## Page 25

1   Q.  Okay.  Were you still working at Continental
2   or after Continental?
3   A.  No, I was not working at Continental.
4   Q.  Okay.  And was somebody suing you, or did you
5   sue them?
6   A.  I sued them.
7   Q.  Okay.  What happened?
8   A.  I was crossing an intersection, and he run the
9   red light.
10  Q.  Were you injured?
11  A.  Yes, I was.  I had to go to therapy.
12  Q.  What kind of therapy?
13  A.  Like a chiropractor.
14  Q.  How often would you see the chiropractor?
15  A.  Twice a week.
16  Q.  And for how long did you do that?
17  A.  Three months, I believe.
18  Q.  Do you recall when that accident was?
19  A.  It was March 25th of last year, I believe,
20  2010.
21  Q.  2010 or 2011?
22  A.  I want to say it was two years ago, in 2010,
23  because it took a long time to – to get it resolved.
24  Q.  Okay.  And so that would have been three
25  months after you left Continental?

ORAL AND /IDEOTAPED DEPOSITION OF
DANIEL PALACIOS

---

## Page 42

1  you spend looking for a job?
2      A.  Now, about three hours.
3      Q.  Three hours every day?
4      A.  Uh-huh.
5      Q.  And you just said it remains the same.  So is
6  that what you have done for the past two years?
7      A.  Yes.
8      Q.  And describe for the ladies and gentlemen of
9  the jury what it is that you do in looking -- that three
10  hours a day that you're looking for a job.
11      A.  Well, basically, I wake up in the morning and
12  go and pick up the paper and the Greensheet.  And I go
13  through -- through the Greensheet, and then I look
14  online.
15      Q.  Okay.
16      A.  And now I'm looking -- not just looking in
17  sales, but I'm looking into mediation and every present
18  opportunity that I might fit for -- for it.
19      Q.  Okay.  And so when you wake up in the
20  morning -- what time do you wake up in the morning?
21      A.  7:00.
22      Q.  Okay.  And you just start that -- I mean, do
23  you have a set time of day when you -- that you spend
24  these three hours looking for a job?
25      A.  In the morning, basically.  Before noon,

## Page 43

1  before 12:00.
2      Q.  Okay.  And then what do you do after noon?
3      A.  I -- I go walk.  I go ride my bike.  I -- I
4  find things to do around the house.
5      Q.  Okay.  Do you drive?
6      A.  I drive.
7      Q.  Okay.  Let me ask you about that.  In terms of
8  your physical condition, are you able to take care of
9  yourself?
10      A.  I don't have any physical impairments.
11      Q.  Okay.  So you -- you take care of yourself,
12  brush your teeth --
13      A.  Right.  Yes.
14      Q.  -- dress yourself, that kind of thing?
15      A.  Yes.
16      Q.  What about cooking and cleaning?
17      A.  I can cook and clean.
18      Q.  Okay.  Is there any activity that you're not
19  able to do, physical activity?
20      A.  No.
21      Q.  Okay.  And in terms of -- you -- you talked
22  before about, I guess, emotional health, for lack of a
23  better term.  In terms of your emotional well-being, do
24  you feel like your emotional well-being keeps you from
25  being able to do anything?

## Page 44

1      A.  No.
2      Q.  Okay.  Has it ever -- has there been a period
3  of time where you felt like you were unable to take care
4  of yourself or anything because of your emotional
5  health?
6      A.  I was unable to -- to -- to -- to answer the
7  questions that I -- that I was being asked when I was
8  interrogated in -- in the meeting that I had with
9  Corporate Security at -- at the airport.
10      Q.  Okay.  Is that the only time you felt like you
11  were unable to comprehend --
12      A.  Right.
13      Q.  -- or do things?
14      A.  Yes.
15      Q.  Just during that meeting?
16      A.  Yes.
17      Q.  Why -- why is it that you think that that
18  meeting you were unable to comprehend at that time?
19      A.  Well, one, because I had -- I want to say it
20  was around seven -- seven management members, you know,
21  like, pointing fingers at me.  And -- and the first
22  thing that I said when -- when I walked in -- I was
23  having lunch first.  When I walked in, I asked for a pen
24  and a piece of paper, because I'm -- I have trouble
25  remember -- remembering things.  And I -- and I wanted

## Page 45

1  to put together what they were asking -- asking me for.
2  So when I asked for a piece of paper and a pen, they
3  were just looking at me like I was crazy.  I mean, it's
4  -- I --
5          THE REPORTER:  I'm sorry.  What?
6          THE WITNESS:  Like if I was crazy.
7      A.  I don't want to offend you, but that's the
8  first thing you asked me, Why are you writing things?
9  And that's because I need a pen and a piece of paper --
10  if I need to remember something, I need to write it down
11  so I can remember it later.
12      Q.  Right.
13      A.  So -- but they didn't -- they didn't
14  understand that.
15      Q.  Okay.  I understand, ultimately, you got a pen
16  and paper, right?
17      A.  Right, I -- yeah.
18      Q.  Okay.  How -- how long was it before you got a
19  pen and paper during that meeting?
20      A.  About 10 minutes.
21      Q.  Okay.  Do you recall how long the meeting
22  lasted?
23      A.  About an hour and a half.
24      Q.  Okay.  All right.  And we'll come back to that
25  meeting.  Let -- let me just finish going over this.

---

12

ORAL AND VIDEOTAPED DE1   SITION OF
DANIEL PALACIOS

| Page 46 | Page 48 |
|---|---|
| 1      In terms of you, yourself, would you – | 1   Q.   2005.  But she passed in 2006? |
| 2   and I'm not asking for any medical opinion, but would | 2   A.   Uh-huh. |
| 3   you diagnose yourself with any kind of disability? | 3   Q.   Is that a "yes"? |
| 4   A.   I don't think I can answer that question | 4   A.   Yes. |
| 5   because I'm not a doctor, but I -- I know -- I know how | 5   Q.   Okay.  All right.  And so were you – are you |
| 6   I feel.  And I only know how I feel when I feel. | 6   an only son, an only child? |
| 7   Q.   Okay. | 7   A.   No.  There's six of us, but I was the one who |
| 8   A.   And that's why I was taking the medicine. | 8   – who had, I want to say, the benefits of flying and be |
| 9   Q.   I understand.  But just you as a layperson – | 9   – be where she was in Mexico within hours – |
| 10   I'm just talking about you.  I'm not asking for a | 10   Q.   Okay. |
| 11   medical opinion.  When somebody asks you, How are you -- | 11   A.   – you know, compared to my brothers. |
| 12   I'm asking you, how are you?  Do you have a disability? | 12   Q.   Right. |
| 13   Do you feel like you have a disability? | 13   A.   So I used to – I used to go, you know, for |
| 14   A.   Now this is better.  Now, if you -- if you -- | 14   three or four days. |
| 15   if you were to ask me the same question, like, two | 15   Q.   I see.  So there's six boys? |
| 16   years, two and a half years ago, I would just tell you | 16   A.   Six boys. |
| 17   plain and simple, no, not good. | 17   Q.   Okay.  I've got five boys in my family. |
| 18   Q.   Okay.  But is there a condition that you would | 18   That's a lot of sons. |
| 19   describe yourself as having? | 19      No daughters? |
| 20   A.   Yes. | 20   A.   No daughters. |
| 21   Q.   What is that? | 21   Q.   Okay.  And so had your father already passed? |
| 22   A.   Deep depression. | 22   A.   He passed when I was four or five, I think. |
| 23   Q.   Okay.  And when do you believe your depression | 23   Q.   I see.  Okay. |
| 24   onset? | 24      And – and so back in 2006 with your |
| 25   A.   When it stopped? | 25   mother's illness, you believe your depression started |

| Page 47 | Page 49 |
|---|---|
| 1   Q.   No.  When it started. | 1   then? |
| 2   A.   When it started?  In 2000 – well, actually, | 2   A.   Yes. |
| 3   it was before that because it started – every – | 3   Q.   Okay.  Do you recall when it was that she did |
| 4   everything started when my – my mom was diagnosed with | 4   finally pass? |
| 5   – with cancer. | 5   A.   When she passed?  It was February 14th. |
| 6   Q.   Right. | 6   Q.   Of 2006? |
| 7   A.   And – | 7   A.   2006. |
| 8   Q.   Let me know if you need to take a break, okay? | 8   Q.   Okay.  Valentine's Day? |
| 9   If you need to break, we can break.  No – no problem. | 9   A.   Uh-huh. |
| 10   A.   Well, everything started when she was | 10   Q.   Wow.  Okay.  All right.  And so – I can |
| 11   diagnosed with cancer, and then I had to – to take care | 11   imagine.  I'm very close to my mother, too.  So I – I |
| 12   of her. | 12   understand your – your sorrow there. |
| 13   Q.   Okay.  Does she live here in Houston, too? | 13      As time went on, did you start feeling |
| 14   A.   (Moving head side to side.) | 14   better after that situation? |
| 15   Q.   Where does she live? | 15   A.   No, not really.  Because she passed in |
| 16   A.   Mexico. | 16   February 2006, and then in March – in March, my – my |
| 17   Q.   Down in – where did you say, Matamoros?  I'm | 17   wife left me and my daughter. |
| 18   sorry. | 18   Q.   I'm – I'm sorry? |
| 19   A.   (Moving head up and down.) | 19   A.   In March, my wife left me – left me, and she |
| 20   Q.   Is that a "yes"? | 20   took my daughter. |
| 21   A.   Yes. | 21   Q.   Okay.  And that would be Anita? |
| 22   Q.   Okay.  And as I recall, and correct me if I'm | 22   A.   (Moving head up and down.) |
| 23   wrong, that was back in 2006 when your mother was | 23   Q.   Anita Palacios? |
| 24   diagnosed? | 24   A.   Yes. |
| 25   A.   It was in 2005. | 25   Q.   Okay.  And you-all were living here in Houston |

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 50

1  at the time?
2      A. Yes.
3      Q. Okay. And when your wife, Anita, left you
4  with Victoria, what happened? You just came home and
5  they were gone all of a sudden?
6      A. (Moving head up and down.)
7      Q. Yes?
8      A. Yes.
9      Q. Okay. And again, Mr. Palacios, if you want to
10  take a break, let me know, okay? We – we can break
11  whenever you need to.
12      A. That's okay.
13      Q. Okay. And – and so I assume that situation
14  was pretty upsetting for you, as well?
15      A. (Moving head up and down.)
16      Q. Yes?
17      A. Yes.
18      Q. Okay. Did – did you at that time seek any
19  type of treatment?
20      A. Yes.
21      Q. What – what type of treatment were you
22  seeking then?
23      A. Can we take a break?
24      Q. Absolutely. Sure. Yes, sir.
25          THE VIDEOGRAPHER: We're going off the

Page 51

1  record at approximately 10:45 a.m.
2          (Brief recess.)
3          THE VIDEOGRAPHER: This is the beginning
4  of Tape 2. The time is approximately 10:52 a.m.
5      Q. (By Mr. Mitchell) Mr. Palacios, are you ready
6  to continue?
7      A. Yes.
8      Q. Okay. You understand you're still under oath?
9      A. Yes.
10      Q. Okay. I want to go back. I was talking to
11  you about your health, for lack of a better term, in
12  terms of physical health, and now we are just discussing
13  mental health.
14          In terms of your mental health, have you
15  ever received any diagnosis from a physician at all
16  regarding any mental condition?
17      A. I had three – I received three – from three
18  doctors, three different doctors.
19      Q. And who are those doctors?
20      A. 2006, when I first went to seek help, it was
21  Dr. Jerri Sethna.
22      Q. S-E-T-H-N-A?
23      A. Yes.
24      Q. Okay.
25      A. And before I took my FMLA, it was Dr. Espitia.

Page 52

1      Q. E-S-P-I-T-I-A?
2      A. Yes.
3      Q. Okay. And that would be in 2009?
4      A. 2009, summer of 2009, I believe.
5          And then Dr. Stockwell.
6      Q. Dr. Stockwell? And when did you see
7  Dr. Stockwell?
8      A. I started seeing him in – it was December
9  2009. It was – I want to say it was the last week in
10  – in 2009 when I started seeing him.
11      Q. So this is right after your employment was
12  ended?
13      A. Yes.
14      Q. Okay. Let's go to Dr. Sethna from 2006. Did
15  you say that Dr. Sethna did diagnose you with a
16  condition?
17      A. Yes. Yes, she did. And –
18      Q. Is that a male or a female?
19      A. It's a female.
20      Q. Oh, okay.
21      A. Jerri Sethna.
22      Q. J-E-R-R-Y [sic]?
23      A. Gerry, G-E-R-R-Y [sic].
24      Q. G-E-R-R-Y. Okay.
25          And what did she diagnose you with?

Page 53

1      A. Depression, deep depression.
2      Q. How long did you see Dr. Sethna?
3      A. I saw her for about four months.
4      Q. And did that start right after your mother had
5  died and your wife had left you?
6      A. Yes.
7      Q. Okay. Why did you stop seeing Dr. Sethna
8  after four months?
9      A. I guess it was -- it was -- I knew that I
10  needed help, but it was lack -- lack -- lack of interest
11  and, you know, having to go back and -- and explain, you
12  know, what you're feeling, my feelings, in this case.
13  And -- and -- and I guess it was pride. But eventually
14  I went back, and -- and -- and -- and I went -- I went
15  back to EAP, and I was referred to -- to a -- a
16  therapist. And -- and I started seeing a therapist
17  after I went to see Dr. Sethna.
18      Q. Okay. I didn't understand that. You -- you
19  saw Dr. Sethna for four months?
20      A. Uh-huh. Yes.
21      Q. And then you started seeing a therapist?
22      A. Right.
23      Q. And then back to Sethna?
24      A. And -- and then I went back to another doctor.
25      Q. Okay. So you only saw Dr. Sethna for the four

14

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 54

1  months?
2      A.  For four months, and that was it.
3      Q.  Okay.  All right.  And so after Dr. Sethna,
4  what therapist did you see?
5      A.  Dominguez.
6      Q.  Mercedes Dominguez?
7      A.  Mercedes Dominguez.
8      Q.  Okay.  And when did you start seeing Mercedes
9  Dominguez?
10      A.  Right after my -- my -- my wife left.
11      Q.  Okay.  Which was in?
12      A.  Around March.
13      Q.  Of 2006?
14      A.  Right.
15      Q.  Okay.  So I just -- I want to try to be sure I
16  understand.  So did you see Dr. -- I'm sorry.  Well,
17  yeah.  Is Mercedes Dominguez a doctor as well, or do
18  you know?
19      A.  You know what?  I don't know.
20      Q.  Okay.  I'll just call her Ms. Dominguez.
21          Did you start -- it is a woman?
22      A.  It's a woman.
23      Q.  Okay.  Did you start seeing Ms. Dominguez
24  before or after Sethna?
25      A.  After Sethna.

Page 55

1      Q.  After Sethna.  Okay.  So if you saw her after
2  Sethna, that means you started seeing Sethna prior to
3  March of 2006?
4      A.  It was around March 2006.  I -- I don't recall
5  the dates.  I apologize.
6      Q.  Okay.  No, that's okay.  I'm just trying to
7  make it make sense.
8          Did you start seeing Dr. Sethna before or
9  after your mother passed?
10      A.  I want to say it was -- it was during because
11  -- let me go back a little bit.  Like I said, I -- I
12  struggled with my -- my mother's illness, and then I
13  used to travel back and forth, back and forth.  And --
14  and I guess that took a toll on my -- my health.  And --
15  and -- you know, and that's why I started trying to get
16  help even before my mom died.
17      Q.  I see.  All right.  And so that's when you
18  were seeing Dr. Sethna.  You saw her for about four
19  months.  And then after that you saw Ms. Dominguez?
20      A.  Ms. Dominguez.
21      Q.  Okay.  And how long did you see Ms. Dominguez?
22      A.  I want to say about -- close to two years, off
23  and on.  But then -- but then be -- in between, I went
24  to see another doctor, which I don't remember her name.
25      Q.  There's one written down here.  Angela

Page 56

1  Ordonez, who is that?
2      A.  No.
3      Q.  Okay.  And then there's another one written,
4  Dr. Miles Glaspy.
5      A.  No.  I saw him last year, I believe.
6      Q.  2011?
7      A.  No.  It was 2010.
8      Q.  2010?
9      A.  Sorry.
10      Q.  That's okay.
11          All right.  And when you were seeing Dr.
12  -- or Ms. Mercedes Dominguez, you said that started
13  March of 2006 for about two years?
14      A.  Right, off and on.
15      Q.  How many times do you think you saw her?
16      A.  Around, I want to say, more than 20 because --
17  because they had given me, like, 20 appointments.  And
18  then after that, I would have to go back and -- and --
19  and -- and get another referral to go back and see her
20  again.  So I did.
21      Q.  Okay.  And when you said "they" had given you
22  that, who -- who gave you the 20 appointments?
23      A.  EAP.
24      Q.  Okay.  And this is the Employee Assistance
25  Program?

Page 57

1      A.  Yes.
2      Q.  Okay.  All right.  And then did Mercedes
3  Dominguez -- was she able to diagnose you with anything?
4      A.  I don't recall.
5      Q.  Okay.  Because you're not sure if that's a
6  doctor or not?
7      A.  Right.
8      Q.  Okay.  And then Leonardo Espitia --
9      A.  Right.
10      Q.  -- you said you saw him in 2009, before FMLA
11  leave?
12      A.  Right.
13      Q.  What were you seeing him for?
14      A.  Depression and -- and -- and -- it was
15  depression.  I was unable to sleep.  At times, I was
16  sleeping too much.  I was unable to eat.  I was -- I
17  couldn't concentrate.
18      Q.  Okay.  And how many times did you see
19  Dr. Espitia?
20      A.  About three or four.
21      Q.  Did he prescribe you any medications?
22      A.  He gave me several medications, yes.  One for
23  sleeping, and he gave me different prescriptions for my
24  -- for my depression.
25      Q.  Okay.  As -- as far as 2009 -- now, this is

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

---

Page 58

1    three years after your mother had passed and three years
2    after your first wife had left you.  What do you
3    attribute the -- your problems with in 2009?
4         A.   Well, at first it was my -- my mom, like I
5    said.  And then after -- after that, it was -- it was my
6    wife, that she left me with -- with my daughter.  And
7    then after that, my daughter was having problems --
8    behavioral problems at school.  And so that took a part,
9    too, you know, just worsened the -- my symptoms -- my
10   symptoms, I guess.  And -- and then I -- I had to file
11   for bankruptcy.
12        Q.   In 2009?
13        A.   In 2009.  Because I -- you know, with -- with
14   my depression and -- not able to sleep or sleeping
15   too much, I -- I -- I didn't work as many hours as -- as
16   I used to, so my checks were not that good.
17        Q.   Okay.  In -- in terms of that, not working,
18   did the company allow you to take off the time you
19   needed to?
20        A.   Not until I -- I took FMLA.
21        Q.   Okay.  And so you took off the FMLA, and
22   that's when you started --
23        A.   I took --
24        Q.   -- getting behind on your --
25        A.   I took FMLA -- no, because I was behind

---

Page 59

1    already because, like I said, I wasn't able to work as
2    many hours as before.  And -- and I was getting close to
3    25, three -- $3,000 every two weeks.  And when I stopped
4    working hours, I was just getting 7, $800.
5         Q.   Okay.
6         A.   And I had to pay the accounts that we had,
7    with my ex, and my house, my car note, utilities.  And
8    then on top of that, I had to, you know, pay child
9    support.
10        Q.   Right.  And -- and so what I'm trying to
11   figure out, though, is, what type -- type of time off
12   were you taking when you started falling so far behind?
13   They just let you take off whenever you wanted to take
14   off?
15        A.   No.  They gave me, I want to say, two and a
16   half months or two months on FMLA.  And I took it
17   because I wanted -- obviously, I wanted to get better,
18   better myself, and I wanted to help my daughter, you
19   know, better herself, too.
20        Q.   Right.  Okay.  Let's -- let's see if I can
21   make it more clear.
22             I understood you to say that you had
23   actually started falling behind on your bills before the
24   FMLA; is that right?
25        A.   Right.

---

Page 60

1         Q.   Okay.  And I also understood you to say the
2    reason why is because your paychecks had been 2,500 to
3    $3,000 every two weeks, and they fell down to about 7 or
4    $800.
5         A.   Right.
6         Q.   Okay.  And my question is --
7              (Loud noise next door.)
8              MR. MITCHELL:  Peter, who's having a
9    party?
10             MR. COSTEA:  Ask Stephen Hart when you
11   get to the office, and he'll tell you.
12             MR. MITCHELL:  Oh, my God.
13             MR. COSTEA:  It happened two months ago.
14   Apparently, on Monday mornings they have, like, a staff
15   meeting.
16             MR. MITCHELL:  Oh, are you serious?
17   Okay.  I'm sorry.  Do you hear that noise in the
18   background?  That's what I was referring to.
19             MR. COSTEA:  It happened in his depo
20   about two months ago.
21             MR. MITCHELL:  Crazy.
22        Q.   (By Mr. Mitchell)  Okay.  And so what I was
23   trying to figure out is, during that time period,
24   Mr. Palacios, where you were saying you were making this
25   7 or $800 every two weeks, obviously you weren't working

---

Page 61

1    as much then, right?
2         A.   Right.
3         Q.   Okay.  And so what type of leave were you
4    taking then?  You would just take off, or how would that
5    work?
6         A.   Working as the -- as the operator, I have the
7    flexibility of giving my hours away to whoever wants to
8    work overtime or -- or my hours.  And I would just work,
9    you know, three or four days out of my 40 hours.
10        Q.   I see.  And so you would just give those hours
11   away?
12        A.   Yeah.
13        Q.   And that's -- the company policy allows you to
14   do that --
15        A.   Right.
16        Q.   -- no problem?
17        A.   You can give up to 50 percent of your shift.
18        Q.   Really?
19        A.   Uh-huh.
20        Q.   Wow.  Okay.  I'd like a job like that.
21             Okay.  And -- and -- and is that
22   completely discretionary?  You're allowed to do it as
23   much as you want to?
24        A.   Yeah.  Well, you have to have, I mean, good
25   attendance and -- and be in good standing with -- you

---

May 14, 2012
Elite Reporting Service, Inc.

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

## Page 62

1  know, not having too many sick calls and stuff like
2  that.
3      Q.  Okay.
4      A.  But, yeah, you can do that.
5      Q.  But -- but you were allowed to do that?
6      A.  Right.
7      Q.  Okay.  And did you ever have any problems
8  taking that type of time off?
9      A.  No.
10     Q.  Okay.  And then in terms of the FMLA leave in
11  2009, you said you were gone for two, two and a half
12  months; is that right?
13     A.  Right.
14     Q.  Okay.  And what was the process by which you
15  obtained the FMLA leave?
16     A.  It was based on -- on my -- my disability --
17     Q.  Uh-huh.
18     A.  -- which is depression.
19     Q.  Okay.  And so, what, you just submitted forms,
20  the company approved it, and you went out on the leave?
21     A.  Well, it's not that easy.  I mean, I -- I went
22  to see Dr. Espitia.  And then he looked at my history, I
23  guess, my records.  And -- and prior to that, I had seen
24  EAP several times.  Before actually -- you actually get
25  referred to a therapist, you have to go so many times

## Page 63

1  and see one of the in-house therapists, I guess I want
2  to call it.  And then after that, you're referred to --
3  to either a psychiatrist or -- or a therapist.  But --
4      Q.  I'm sorry.  You said referred to what or a
5  therapist?
6      A.  To psychol -- a psychiatrist.
7      Q.  Psychiatrist or a therapist.  Okay.
8      A.  Yes.  So I went to see Dr. Espitia, and then
9  he asked me, you know, about my history and what -- why
10  I was depressed and all these questions.  And he
11  contacted EAP, I think.  And that's when I -- he signed
12  my petition to take FMLA.
13     Q.  Okay.  And so he signed the form, you turned
14  it in, and then what happened?
15     A.  I turned it in, and then I was granted that
16  time that I was ask -- asking for, and I took it.
17     Q.  Okay.  And did you have any problems getting
18  the FMLA approved?
19     A.  No.
20     Q.  Okay.  And my understanding is, as far as FMLA
21  leave, that only happened the one time in 2009; is that
22  correct?
23     A.  That was -- that was -- in 20 years, I only
24  took it that one time.
25     Q.  Okay.  I understand.

## Page 64

1      All right.  And so then, going back to --
2  well, let me just go on and finish this.
3      You had seen Dr. Sethna, who said you had
4  deep depression in 2006.  And then Leonard Espitia also
5  said depression in 2009; is that right?
6      A.  Correct.
7      Q.  Okay.  In terms of yourself, during these
8  periods of time -- or -- or do you still feel like you
9  have depression now?
10     A.  I do, because I -- I -- I still don't have a
11  job.
12     Q.  Okay.  And so during the times when you have
13  depression, are you able to work?
14     A.  I was able to work, yes.  That's why I kept
15  applying for jobs and looking online, looking at
16  newspapers, and trying to -- to get out of what I have.
17     Q.  Okay.  Was there ever a time since 2006 when
18  you went into the depression where you felt like you
19  were not able to work?
20     A.  Yes.  It was a time when I was giving away all
21  my hours.
22     Q.  Okay.
23     A.  And I -- I never really cared about, you know,
24  losing my house, for instance, you know.  Just -- just
25  -- just -- I mean, I was not in a state of mind of

## Page 65

1  really caring about house or cars or accounts.
2      Q.  Okay.  And then when you came back -- or -- or
3  how long a period of time did that exist where you felt
4  like you were not able to work?
5      A.  My worst?  I want to say between 2005 -- 2006
6  and 2010, five years.
7      Q.  Okay.  So that for that whole five-year period
8  of time, you felt like you were not able to work or --
9      A.  It -- it took -- I mean, it -- it would take a
10  great deal of effort for me to really get up and say,
11  you know, I want to get up and go to work.  It took
12  effort, just the fact of, you know, doing things around
13  the house and -- and bathe, for that matter, or shave.
14     Q.  Okay.  And -- and describe to us, like, what
15  you were going through at that period of time.  How does
16  that manifest itself?
17     A.  Well, at times -- like I said, at times that I
18  was sleeping too much.  I remember one day that I slept
19  -- I slept for almost two days.  And then sometimes I
20  didn't sleep.  I didn't eat.  And then I would -- I
21  would not watch TV.  I'd just be sitting in my living
22  room and just, you know, blank.
23     Q.  Okay.  Let me see if I have this right.  In
24  terms of this period of time, I guess during 2006
25  through the present, who was living with you at the

ORAL AND/VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 66

1  time?  Ms. Palacios -- Anita Palacios left in March of
2  2006?
3       A.  She left -- after she left, I had a roommate,
4  a friend who -- who -- who used to work at the airport.
5       Q.  Who was that?
6       A.  Hector.
7       Q.  Do you know his last name?
8       A.  C-H-U-M.
9       Q.  Chum?
10      A.  Yes.
11      Q.  Okay.  How long did Hector live with you?
12      A.  About eight months.
13      Q.  Did he move in immediately after Ms. --
14      A.  No.
15      Q.  -- Anita left?
16      A.  No.  I -- I was by myself for about 10 months,
17  I think.
18      Q.  So he probably came right around the beginning
19  of 2007?
20      A.  Yeah.
21      Q.  And how long did he live there?  Eight months,
22  you said?
23      A.  Yeah, close to that.
24      Q.  Let me ask you this:  Did Ms. Anita Palacios
25  work with you at the airport?

Page 67

1       A.  That's how we met, yes.
2       Q.  Okay.
3       A.  But she -- she actually stopped working in
4  2005.
5       Q.  What did she do?
6       A.  She was -- she worked in Resources.
7       Q.  In what?
8       A.  Resources.
9       Q.  Resources?  What does that mean?
10      A.  Manpower.
11      Q.  Okay.  What about Amy Palacios; did she work
12  at the airport?
13      A.  Yes.
14      Q.  What did she do?
15      A.  She's a customer service agent.
16      Q.  Do you know if she's still there?
17      A.  She is.
18      Q.  And then Sandra Somoza, does she work there,
19  as well?
20      A.  Yes.
21      Q.  What does she do?
22      A.  She's a sales agent.
23      Q.  Is that the same thing you were, a sales
24  agent?
25      A.  Right.

Page 68

1       Q.  So all three of those women you met at the
2  airport --
3       A.  Yes.
4       Q.  -- through work?
5       A.  Well, my first wife, she went to work at the
6  airport, like, two years after we got divorced.
7       Q.  Anita Palacios did?
8       A.  Right -- no, no, no.  Amy.
9       Q.  Amy.
10      A.  Amabely.
11      Q.  I'm sorry?
12      A.  Yeah.
13      Q.  So she went to work there -- you got divorced
14  in '97 or '98?
15      A.  Then she went to work, like, two or three
16  years -- maybe two years after that.
17      Q.  Okay.  So you met her before --
18      A.  Yes, somewhere else.
19      Q.  -- work?  Okay.
20           But then the second wife was Anita?
21      A.  Right.
22      Q.  And you met her at the airport?
23      A.  I met her at the airport.
24      Q.  Okay.  And then Sandra you also met at the
25  airport?

Page 69

1       A.  Right.
2       Q.  Okay.  How is it that you became employed at
3  Continental?
4       A.  In 2000, I think I started -- no.  In '91, I
5  started working at Continental.  So in 1990, I -- I went
6  to -- I took -- what is it called -- System 1.  I went
7  to take System 1, which is the system that
8  they used at the airport and then in travel agents.  So
9  after I took that, I went to apply, and then that's how
10  I got my job.
11      Q.  And what was your job?
12      A.  Sales agent.
13      Q.  And is that your job that you stayed in the
14  whole time?
15      A.  Yes.
16      Q.  All right.  Sometimes I see it referred to --
17  it talks about something about -- did you have some kind
18  of special designation because you were fluent in -- in
19  two languages?
20      A.  Not really.  I mean, they -- they move agents,
21  like, to where the Customs and Immigrations is.  And
22  then they also have departures and also the ticket
23  counter.  No.  I mean, they're basically everywhere.
24      Q.  Okay.  But -- but again, what was your title?
25      A.  Sales agent.

18

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 70

1    Q.  Sales -- sales agent.
2    A.  But I -- I -- I used to get an override for
3  speaking Spanish, so...
4    Q.  You used to get what?
5    A.  An override.
6    Q.  An override?
7    A.  Yeah.
8    Q.  What does that mean?
9    A.  That -- that I used to get one -- a dollar
10  fifty more for speaking another language.
11    Q.  Maybe that's what I saw.  I remember -- I
12  recall seeing something about being fluent in another
13  language.
14        Okay.  And so as a sales agent, would you
15  work the ticket counter, or where would you work?
16    A.  I worked everywhere.
17    Q.  Okay.
18    A.  Ticket counter, gates, where Customs is, where
19  Immigration is, baggage.
20    Q.  Okay.  And I have down that you were hired
21  there originally January of 1991; is that right?
22    A.  Yes.
23    Q.  And what kind of training do you go through
24  when you first get hired?
25    A.  Safety, computer training, how to treat

Page 71

1  customers.
2    Q.  Okay.  And I understand that in December of
3  1995, your employment was terminated for absenteeism?
4    A.  No, that's -- no, that's -- that's not
5  correct.
6    Q.  What happened in 1995?
7    A.  In 1995 -- no.  I believe that I took a leave
8  of absence --
9    Q.  Okay.  So as far as you recall, you were
10  never --
11    A.  -- for three months.
12    Q.  -- fired?
13    A.  No.  No, I was not terminated.  However, I --
14  I was terminated after -- after 9/11.
15    Q.  Okay.  Let me show you --
16    A.  But they brought me back.
17    Q.  Let me show you what I'm going to mark here as
18  Exhibit No. 2 to your deposition, which is a letter
19  dated January 19, 1995, and ask you if that's got your
20  signature at the bottom of it.
21        (Exhibit No. 2 was marked.)
22    A.  That looks like -- like my signature, but I
23  was...
24    Q.  And you recognize that name, Cindy Finken --
25    A.  Yes.

Page 72

1    Q.  -- F-I-N-K-E-N?
2    A.  (Moving head up and down.)
3    Q.  Okay.  Does this re -- remind you of anything
4  or ring a bell to you?
5    A.  It does, but it does -- it doesn't make any
6  sense, because if -- if -- if I was terminated in this
7  year, then why...
8    Q.  Well, let's look at it.  It says, "As a result
9  of our conversation on Thursday, January 18, 1995, I
10  made the decision to bring you back to work effective
11  January 19, 1995."
12        Do you see that at the top?
13    A.  Right.  Right.  Right.
14    Q.  And then she goes on to say, "During the
15  period of time from November 12 through December 16,
16  1995, you had a" -- I can't read that, something.  Then
17  it goes on to say, "on November 12, called in sick,
18  November 13, 14, 15, had two scheduled" --
19        MR. COSTEA:  Days off.
20    Q.  (By Mr. Mitchell) -- "days off November 16
21  and 17 and did not report for work from November 18
22  through" -- and then I can't see it again.  And then it
23  goes on to say, "you were administratively terminated."
24  Do you see that?
25    A.  Yes, I remember.

Page 73

1    Q.  Does that ring a bell to you now?
2    A.  Yes, it does.  I took a leave of absence, and
3  I had faxed some paperwork.  And, apparently, they --
4  they weren't able to find it.  And then after that,
5  that's when I went back.  She called me back, and -- and
6  she took me back.
7    Q.  Okay.  And so you're saying, yeah, your
8  employment was terminated, but you explained that there
9  must have been some --
10    A.  I -- I don't recall, you know, termination in
11  this year.  But I guess if it's in writing and if I
12  signed it, then I guess it's true.
13    Q.  Okay.  What were you thinking had happened?
14    A.  I had forgotten.  I don't -- I don't know.
15    Q.  Okay.  Then at the bottom, right before your
16  signature, it says, "Daniel, you" -- I think it should
17  say your -- "continued employment at Continental
18  Airlines is contingent upon your ability to come to
19  work.  I am providing you with that chance.  Understand
20  one instance prior" -- something -- "time your
21  attendance reaches an acceptable level will result in
22  your termination of employment."
23        But again, this is obviously something
24  very old.  And that's the only copy I have --
25    A.  Yeah.

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 86

1  Exhibit No. 4 has a cover page on it versus --
2      A.  It looks like the same thing.
3      Q.  Is that what it is?  So Exhibit No. 4 has a
4  cover page on it that Exhibit No. 8 does not have?
5      A.  Right.
6      Q.  Okay.  But again, as far as Exhibit No. 8 now,
7  all that handwriting on there is yours?
8      A.  Yes, it is.
9      Q.  Okay.  And then let -- let me ask you this:
10  Describe for us what the Conflict of Interest Policy was
11  at Continental.
12      A.  It is that you're not supposed to do any
13  ticket changes to friends and family members.
14      Q.  Not -- not supposed to do them at all?
15      A.  You can, but it has to be authorized by a
16  supervisor or a member of management.
17      Q.  Okay.  And how did you know that that was what
18  the policy was?
19      A.  Because that's what I've been doing, you know,
20  since I started working.
21      Q.  Okay.  And so --
22      A.  Ever since they implemented that system.
23      Q.  The policy that we looked at there --
24      A.  Right.
25      Q.  -- in Exhibit No. --

Page 87

1      A.  7.
2      Q.  -- 7?  6 and 7?
3      A.  (Moving head up and down.)
4      Q.  Okay.  Yes?
5      A.  Yes.
6      Q.  Okay.  And so, no doubt, you understood that
7  to be the policy?
8      A.  Right.
9      Q.  Okay.  And what about -- what was the policy
10  with respect to Buddy Passes and what you could do --
11  how you could use Buddy Passes?
12      A.  They all have guidelines.
13      Q.  Okay.  And -- and what were they like?
14      A.  Well, one, if -- if -- if you -- if you were
15  to use an int -- international Buddy Pass, you -- you
16  were supposed to travel with whoever you give the Buddy
17  Pass to.
18      Q.  Right.  Okay.  Any other parts of that Buddy
19  Pass policy that you can recall?
20      A.  Dress code.
21      Q.  Dress code?
22      A.  Dress code.
23      Q.  What was that?
24      A.  Before -- now it's changed -- changed.
25  Before, you -- you couldn't use shorts, and now you can.

Page 88

1      Q.  Okay.
2      A.  Or simple T-shirts.
3      Q.  Okay.  What about as far as the level that
4  people traveled on Buddy Passes?
5      A.  The level?
6      Q.  Whether or not --
7      A.  The pass classification?
8      Q.  Pass classification.  I'm sorry.  Yes.
9      A.  Well, as an employee, you go first.  As a
10  member of management, you go first.  And then -- and
11  then employee, like an airport employee, they go second.
12  And then family members go third, and then unaccompanied
13  Buddy Passes go last.
14      Q.  Okay.  And how would that pass classification
15  be specified?
16      A.  As I said, Buddy Passes -- as I said, Buddy
17  Passes are class -- classified as SA5s.
18      Q.  Okay.
19      A.  Family members, like my wife or my mom or my
20  -- my kids, they're SA4s.
21      Q.  Okay.
22      A.  We, as an employee, are SA3s.
23      Q.  So what if you were traveling as an SA3 with
24  somebody who had an SA5 pass, would they be able to have
25  the same rights that you did as an SA3?

Page 89

1      A.  Having the same rights, yes.
2      Q.  And so if somebody was traveling with you as
3  an SA5 and you're an SA3, and then there's somebody else
4  who had an SA5 pass but they were traveling just by
5  themselves, so it was a domestic one, would that SA5
6  person traveling with you have a higher priority --
7      A.  Yes, it does.
8      Q.  -- than the SA5 traveling by himself?
9      A.  Yes, it does.
10      Q.  Okay.  And so in order for a person on an SA5
11  to have a higher classification, they needed to have
12  been traveling with somebody with a higher
13  classification?
14      A.  Correct.
15      Q.  Okay.  Otherwise, you're just at the bottom
16  with other SA5s, right?
17      A.  Right.
18      Q.  Okay.  All right.  Let's -- let's talk about
19  what happened on December 3rd, 2009.  That's the day
20  when Corporate Security came and -- and interviewed you.
21  Okay?  Do you recall that date?
22      A.  Right.
23      Q.  All right.  Tell us, how did that begin?  How
24  did -- how were you informed of the interview with
25  Corporate Security?

May 14, 2012
Elite Reporting Service, Inc.

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

---

Page 94

1  Corporate Security, for whatever reason, yes.
2      Q.  Okay.  So --
3      A.  I can't tell you how often this happened.
4      Q.  Right.  So over your almost 20 years of
5  working at Continental, you've known about those
6  investigations taking place?
7      A.  Right.
8      Q.  What's your understanding about how the
9  investigations would be initiated?  What would start
10  them?
11     A.  I couldn't tell you.  I mean, I...
12     Q.  No idea?
13     A.  No.
14     Q.  Okay.  And again, you said you had never
15  worked in the Corporate --
16     A.  No.
17     Q.  -- Security, correct?
18     A.  (Moving head side to side.)
19     Q.  Okay.  So when you get to the meeting, who
20  talks, what do they say?
21     A.  First, they -- they handed me a list of
22  persons that I had given Buddy Passes to.
23     Q.  Okay.  Let me show you what I'm going to mark
24  here as Exhibit No. 9 and ask you if this is the list of
25  persons that you're referring to.

---

Page 95

1          (Exhibit No. 9 was marked.)
2      A.  Yes.
3      Q.  Okay.  And this says, "Corporate Security
4  Pre-Interview Questionnaire," right?  Does it not?
5      A.  Yes.
6      Q.  And that information that's on the front page
7  there, the handwriting, that's your handwriting?
8      A.  Right.
9      Q.  And some of these say, "Don't know; Friend."
10  And I guess those are the only two things you wrote; is
11  that right?
12     A.  Right.
13     Q.  All right.  On the second page, is that your
14  signature?  And again, very light copies.  But as far as
15  you can tell, is that your signature?
16     A.  Right.
17     Q.  Okay.  All right.  So they give you this
18  questionnaire, and -- and what do you do?  What happens?
19     A.  Well, before I went in there, like I said, I
20  asked for a pen and paper.  And when I first asked for
21  that, they -- they looked at me like if I was crazy.
22  And, finally, after 10 minutes of asking that, it was
23  provided to me.  Because what I wanted to do is
24  recollect what they were asking me for.
25     Q.  Okay.

---

Page 96

1      A.  And one thing that you probably don't
2  understand is that we, as Latinos, Hispanics, or however
3  -- however you want to put it, we -- if -- let's say
4  Peter, we -- we usually have nicknames for almost every
5  person.  And here they've given me their -- their
6  complete names, which for me to just -- it's hard to
7  remember when -- when you go by nicknames.
8      Q.  Okay.  All right.  So in any event, you get
9  this form.  You fill it out.  After 10 minutes, you get
10  your pen and paper.  What happens after that?
11     A.  They gave me a copy of -- of my travel that
12  I've done in the past 10 years, I guess.  And -- and
13  they were asking me to -- to answer -- to answer
14  questions that I -- that I was being asked, which I -- I
15  can't remember the questions --
16     Q.  I understand.
17     A.  -- that they asked me.
18     Q.  Okay.  And I understood your testimony before
19  to say that that meeting lasted an hour and a half or
20  so?
21     A.  It was, yeah, close to that.
22     Q.  Okay.  I also understand that at one time they
23  asked you to give a personal statement; is that right?
24     A.  Right.
25     Q.  And you refused to give a statement?

---

Page 97

1      A.  I refused to sign the form.
2          (Exhibit No. 10 was marked.)
3      Q.  Okay.  Let me show you what I've marked there
4  as Exhibit No. 10 and ask you if that contains your
5  signature on it.
6      A.  Yes.
7      Q.  Okay.  And this says, "I, Daniel Palacios,
8  employee number 61219, make the following statement
9  consisting of ____ pages.  It is made voluntarily and
10  unconditionally while under no coercion or duress.  I
11  attest by signature that the following facts are true
12  based upon my personal knowledge."  And then under that
13  it looks like you wrote, "I decline any statement"; is
14  that right?
15     A.  Right.
16     Q.  And what is that letter under the words under
17  there?
18     A.  I don't know.
19     Q.  Did you write that?
20     A.  I probably did.
21     Q.  Okay.  But no doubt that's your signature on
22  there?
23     A.  It is.
24     Q.  Okay.  And why did you not want to give a -- a
25  personal statement?

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 98

1    A.  Because I -- I wasn't able to recall all the
2    questions that -- that I was -- that I was being asked.
3    Q.  Okay.  When were you asked to give a
4    statement, in the beginning or the end?
5    A.  At the end.
6    Q.  Okay.  And so you go in and the first thing
7    they do is give you what I showed you there in Exhibit
8    No. 9 that has a list of names on it where you write
9    some people friends and some you don't know, and then
10   they question you?
11   A.  I was -- they questioned me, but I was never
12   provided -- provided a copy like you're doing right now.
13   Why don't you look at this?  I was never provided a copy
14   of the things that I was, I guess --
15   Q.  Being questioned about?
16   A.  -- being questioned about.
17   Q.  Okay.
18   A.  And so, I mean, they wanted me just to -- to
19   come up with an answer right there and then, which I
20   couldn't do.
21   Q.  I understand.  All right.  And so then after
22   the questioning is done, then they say, Well, look, you
23   can also write a personal statement; is that right?
24   A.  Right.
25   Q.  All right.  And then you declined to do that?

Page 99

1    A.  Right.
2    Q.  Okay.  And why did you decline to do that?
3    A.  Because they -- they -- they wanted me to --
4    to -- I guess to say that I was guilty on -- on -- on
5    whatever I was accused of.  And -- and I -- I didn't
6    feel like that -- that I had to sign anything or give --
7    give any statement --
8    Q.  That --
9    A.  -- if I didn't know what -- what they were
10   talking about at -- at that time.
11   Q.  Okay.  Did anybody say, Mr. Palacios, we want
12   you to write a statement saying that you're guilty of
13   anything?
14   A.  I don't recall that, no.
15   Q.  Okay.  What they did is told you, We want you
16   to write a personal statement regarding any of this
17   information that we've talked to you about, correct?
18   A.  Correct.
19   Q.  Okay.  And in your personal statement, you
20   could have said, I deny any guilt; I have done nothing
21   wrong, anything like that, correct?
22   A.  Possibly.
23   Q.  Okay.  I mean, it was up to you to decide what
24   to write or not to write in your personal statement,
25   right?

Page 100

1    A.  Right.
2    Q.  Okay.  All right.  And so you're given this
3    form to fill out a personal statement.  You decline to
4    do that.  What happens after that?
5    A.  They took -- they took my badges, and -- and I
6    left the room.
7    Q.  Okay.  Was there any time during that meeting
8    where you said, Hey, I believe that I'm being
9    discriminated against or being retaliated against?
10   A.  Yes.
11   Q.  When was that?
12   A.  When I spoke to my -- my EIT member.
13   Q.  During that meeting?
14   A.  Right.  And that's -- that's when -- they
15   should have known that I had a -- a -- a disability
16   right there and then when I went in there.  And -- and
17   -- and so I asked my EIT member to -- to take a break,
18   five minutes.
19       We went outside, and I told her exactly
20   what was going on, because she had -- she had never seen
21   me, you know, acting like that, that way.  So I told her
22   what I had, and then she went in there and -- and she
23   asked the HR person what I -- you know, what I had.  She
24   -- she told the HR person what I had and if -- if I had
25   to continue with -- with the interview process, and she

Page 101

1    said, Yes.  So I just --
2    Q.  All right.  Mr. Palacios, let me be clear.
3    Are you saying that that happened in that meeting, the
4    very first meeting?
5    A.  Yes, it happened the very -- very first
6    meeting.
7    Q.  Okay.  You understand -- and the EIT person
8    you're talking about is Irene Mosqueda, correct?
9    A.  Right.
10   Q.  You understand that Ms. Mosqueda has written
11   statements about what happened?
12   A.  Right.
13   Q.  Okay.  And do you have any reason to say that
14   Ms. Mosqueda would lie about what -- what happened
15   during that meeting?
16   A.  No.
17   Q.  Okay.  All right.  And so you're saying that
18   during the meeting, you asked for a break, went out into
19   the hallway and had a conversation with Ms. Mosqueda?
20   A.  Right.
21   Q.  Okay.  And what did you tell Ms. Mosqueda?
22   A.  I told Ms. Mosqueda that -- that I was under a
23   lot of pressure and -- and that I had depression and
24   that I was taking medicine and I wasn't able to
25   recollect all the questions that -- that I was being

26

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 102

1   asked.
2       Q.  Okay.  That's all you told her?
3       A.  And that's -- that's what I can remember at
4   this time.
5       Q.  Okay.  And so then after you walk into the
6   hallway, you come back.  And what happens after that?
7   What does Ms. Mosqueda say?
8       A.  They just continue questioning me.
9       Q.  Did Ms. -- did Ms. Mosqueda say anything?
10      A.  Ms. Mosqueda -- yes.  She -- she told the HR
11  person what I had -- what I had just told her outside,
12  that I had a disability.
13      Q.  Were you present for that?
14      A.  I think I was.
15      Q.  So as I understood -- we just went over --
16  there was a group of six people in the room.  All those
17  people stayed in the room the whole time; is that right?
18      A.  Right.
19      Q.  Except for when you and Ms. Irene Mosqueda
20  walked out?
21      A.  Right.
22          MR. MITCHELL:  Okay.  We have to take a
23  break real quick.
24          THE VIDEOGRAPHER:  This is the end of
25  Tape 2.  We'll proceed on to Tape 3.  The time is

Page 103

1   approximately 11:49 a.m.
2           (Brief recess.)
3           THE VIDEOGRAPHER:  This is the beginning
4   of Tape 3.  The time is approximately 11:56 a.m.
5       Q.  (By Mr. Mitchell)  Mr. Palacios, you
6   understand you're still under oath?
7       A.  Yes.
8       Q.  Okay.  I want to go back to this very first
9   meeting that we were talking about that occurred on 11
10  -- November 3rd, 2009.  And you just testified that
11  during this meeting you and Ms. Irene Mosqueda left,
12  went -- went outside the room.  You had a conversation
13  with her.  She came back in and then told Ms. -- the HR
14  lady, who I understand to be Karen Rodarmel, that you
15  have a disability.  Is that your testimony?
16      A.  Correct.
17      Q.  Okay.  And who all was present for that?
18      A.  The remain -- remaining five other persons.
19      Q.  Okay.  So it's not like anybody left the room,
20  correct?
21      A.  I don't think so, no.
22      Q.  All right.  And did you hear Ms. Irene
23  Mosqueda say this -- say anything to Karen Rodarmel --
24      A.  I didn't --
25      Q.  -- to the HR person?

Page 104

1       A.  I didn't hear that, but she told me that she
2   had done that.
3       Q.  Well, where had she done it?
4       A.  Right there in front of me.
5       Q.  Okay.  But you didn't hear it?
6       A.  No.
7       Q.  Okay.  All right.  And would it be your
8   understanding or your belief that everybody in the room
9   could have heard anything that Irene said to the HR
10  lady?
11      A.  Right.
12      Q.  Okay.  You filed an EEOC charge against
13  Continental, didn't you?
14      A.  I did.
15      Q.  Okay.  And you recall preparing a statement
16  regarding your allegations of discrimination in that --
17      A.  Right.
18      Q.  -- charge?
19          (Exhibit No. 11 was marked.)
20      Q.  Let me show you what I've marked here as
21  Exhibit No. 11 to your deposition and ask you if that's
22  the EEOC charge that you filed.
23      A.  Right.
24      Q.  Okay.  Just looking at the statement there,
25  beginning on Paragraph 5 on the second page, it says,

Page 105

1   "During this period, Respondent questioned me about an
2   alleged violation of the Friends and Family and pass
3   policy."
4           Did I read that correctly?
5       A.  Yes.
6       Q.  You go on to say in No. 6, "I attempted to
7   answer Respondent's questions.  However, my medical
8   condition and the side effects of its treatment
9   prevented me from recalling the events in detail."
10          Did I read that right?
11      A.  Yes.
12      Q.  In Paragraph 7, you say, "I repeatedly
13  informed Respondent that I did not recall the
14  allegations or facts they were bombarding me with.
15  Respondent denied my request for a pen and paper."
16  Correct?
17      A.  Correct.
18      Q.  Okay.  Then you say, "When I declined" -- in
19  Paragraph No. 8, "When I declined to comment further or
20  sign their personal statement, I was accused of not
21  collaborating with their process and ultimately
22  terminated."
23      A.  Correct.
24      Q.  Did I read that correctly?
25      A.  Yes.

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

## Page 106

1     Q.   Okay. Now, at least in this EEOC charge, you

2 don't say anything about, I told the respondent or my

3 EIT representative told the respondent I had a

4 disability, correct?

5     A.   Right.

6     Q.   Okay. Why didn't you put that in your EEOC

7 charge?

8     A.   Again, because I simply forgot.

9     Q.   Simply forgot? Okay.

10     You also recall that you wrote a long --

11 a very long, detailed statement contesting your

12 employment with Continental, right?

13     A.   Right.

14     Q.   And do you recall, as we sit here just right

15 now, whether or not you said anything about that in your

16 detailed statement that you prepared?

17     A.   I don't recall.

18     (Exhibit No. 12 was marked.)

19     Q.   Let me show you Exhibit No. 12 to your

20 deposition and ask you if that is the letter that you

21 prepared.

22     A.   Right.

23     Q.   It is?

24     A.   Yes, it is.

25     Q.   Is that your signature on the last page of

## Page 107

1 that?

2     A.   Yes, it is.

3     Q.   And did you actually type out this letter,

4 yourself?

5     A.   No.

6     Q.   Who typed it for you?

7     A.   My -- my wife.

8     Q.   Your wife?

9     A.   I -- I was -- my fiance. I was telling her

10 exactly what happened and how it happened and...

11     Q.   Okay. And it is your belief that Ms. -- your

12 wife typed out everything you told her?

13     A.   I think so, yes.

14     Q.   All right. Looking at the second paragraph,

15 you talk about who was present. You said, "As indicated

16 in the termination letter, I participated in an

17 impromptu meeting on November 3rd, 2009 where present

18 were Elizabeth Condon and Richard Stepanski from

19 Technical Investigations, HR manager - Karen Rodarmel,

20 Assistant Director - Malcolm Gearing, and EIT

21 Representative - Irene Mosqueda."

22     Did I read that correctly?

23     A.   Yes.

24     Q.   You go on to say, "During this meeting and

25 interrogation process, I repeatedly informed all staff

## Page 108

1 members of my inability to recall specific situations

2 and facts related to the allegations being made against

3 me."

4     Did I read that correctly?

5     A.   Yes.

6     Q.   "Throughout the meeting, I felt dazed,

7 harassed, coerced, and overwhelmed. To make matters

8 worse, when I requested a pen and paper to assist in me

9 collecting some of the information that was being thrown

10 at me, I was sneered at, belittled and humiliated."

11     Did I read that correctly?

12     A.   Yes.

13     Q.   "Mr. Gearing even went so far as to make a

14 snide remark stating, quote, 'Danny, make sure you write

15 on your little notes that you are not collaborating with

16 the investigation,'" end quotes.

17     Did I read that right?

18     A.   Yes.

19     Q.   All right. "During my tenure, the company has

20 prided itself on the, quote, 'Fly to Win,' end quotes,

21 platform, focusing one of its four pillars, quote,

22 'Working Together,' ends quotes, on treating each other

23 with dignity and respect. However, this is not how I

24 feel I was treated during the meeting."

25     Did I read that correctly?

## Page 109

1     A.   Yes.

2     Q.   All right. Now, also in this statement -- and

3 you can feel free to read the whole thing if you like.

4 But there's nothing in this statement about you and

5 Ms. Irene walking out and Irene coming back in and

6 saying, Hey, Mr. Palacios has a disability.

7     A.   I simply forgot --

8     Q.   Okay.

9     A.   -- to mention it.

10     Q.   Well, let me ask you this, because my

11 understanding is -- and we'll go over Ms. Mosqueda's

12 statement. But my understanding is that that issue did

13 come up, but it was not in this first meeting; it was

14 actually in the second meeting where you appealed.

15     As you sit there now, are you saying

16 beyond any question you know that in this very first

17 meeting is when Ms. Irene said, Hey, Danny has a

18 disability?

19     A.   I'm going to say that -- that I'm possibly

20 mistaken and it -- that it didn't happen in the first

21 one, but it happened in the second or third one.

22     Q.   Right. Okay. And -- and -- and, you know, I

23 don't want to put words in your mouth. I want you to

24 give as truthful and accurate testimony as you can.

25 But, if you will, go back to that very first meeting

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

---

## Page 110

1     there when these six people were there.  Do you recall
2     specifically, Yeah, me and Irene walked out, and then
3     she came back in and told Karen that, He's got a
4     disability?
5         A.  I remember taking a – a break and – and
6     going out of the room with – me and – and Irene
7     Mosqueda.  And we discussed something that – and I'm
8     sure that it was the fact that – that I – that I had a
9     disability.
10       Q.  Do you recall during the very first meeting
11    Ms. Mosqueda coming in and having a conversation with
12    anybody in that meeting, saying you had a disability?
13       A.  I'm pretty sure that she did.
14       Q.  In the very first meeting?
15       A.  I'm pretty sure that – yes.
16       Q.  Okay.  But you can't recall what the words
17   were?  You didn't –
18       A.  No.
19       Q.  – hear what the words were?
20       A.  No.
21       Q.  I'm sorry?
22       A.  No, I – I don't recall that.  I was in a lot
23   of stress, like I said.
24       Q.  You were what?
25       A.  I was in – in a lot of stress.

## Page 111

1       Q.  Okay.  And, in fact, you said that – looking
2   at your statement here dated January 5th, 2010, you said
3   you were sneered at, belittled and humiliated.  How was
4   that done?
5       A.  Well, I – it was done by mainly one person.
6       Q.  Who was that?
7       A.  Malcolm Gearing, and – and he was the person
8   that said make – Danny, make sure and write on your
9   little notes that you are not collaborating with – with
10   the investigation.
11       Q.  Okay.  And is that how you considered that you
12   were being sneered at, belittled and humiliated?
13       A.  No.  I considered that – he was sitting in
14   that chair.  And – and if I look at you like this
15   (indicating) – every time that – that you ask
16   something, every time that you talk, if I look at you
17   like this (indicating), how – how would that make you
18   feel?
19       Q.  You tell me.  How did it make you feel?
20       A.  It makes me feel just like I described in this
21   letter.
22       Q.  Okay.  And so just because he looked at you
23   with his eyes –
24       A.  He – it wasn't just – it was not just a look
25   like I'm looking at you right now.

## Page 112

1       Q.  What else was it?
2       A.  It was like anger.  Because, supposedly, he
3   thought that I was not collaborating with the
4   investigations or answering the questions that have been
5   asked – you know, asked – he's supposed to – that I
6   was supposed to – to answer.
7       Q.  Okay.  And so did he say anything to you
8   besides, Be sure you write that down on your piece of
9   paper?
10       A.  You know, a look – a look can – can say a
11   lot of things.
12       Q.  A look can say a lot of things?
13       A.  Yes.  I mean, can you tell the difference
14   between – between the look that – between a look that
15   your mom gives you and – and a look that somebody would
16   give you if you hit their car?
17       Q.  Well, what's important is whether or not
18   you –
19       A.  Well, I'm just trying to give you –
20       Q.  – can tell that.
21       A.  – an example of the types of looks that –
22   that – that vary.
23       Q.  Okay.  But – but the question is, besides
24   that statement, is everything we're talking about as far
25   as you being belittled and humiliated –

## Page 113

1       A.  Right.
2       Q.  – just these looks that Malcolm was giving –
3       A.  Right.
4       Q.  – giving you?
5       A.  Uh-huh.
6       Q.  Is that right?
7       A.  Yes.
8       Q.  Okay.  So he only made the one statement to
9   you?
10       A.  Right.
11       Q.  Okay.  No other belittling or humiliating
12   statements?
13       A.  No.
14       Q.  Okay.  All right.  So – so your testimony –
15   I believe you're saying now that you guys come back in.
16   Irene makes a statement to Karen that you don't hear.
17   And then what happens after that?
18       A.  She made a statement that – that I didn't
19   what?
20       Q.  You said you didn't hear the statement that –
21       A.  Right.
22       Q.  – Irene made to Karen, right?
23       A.  I didn't.
24       Q.  Okay.  And so you don't know what she said to
25   Karen?

ORAL AND /IDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 114

1    A. I -- I -- I don't recall right now, no.
2    Q. Okay. And then what happened after that?
3    A. They're just continuing asking me questions.
4    Q. Okay. And then ultimately what happens?
5    A. They -- I mean, they -- they -- they didn't
6    stop. They -- they were just continuing asking me
7    questions. And -- and -- and I guess they wanted me
8    to -- to answer right there and then, when I didn't
9    remember anything.
10   Q. Okay. And so, presumably, the questions end
11   at some period of time.
12   A. That's when they gave me this piece of paper,
13   and they wanted me to sign it.
14   Q. Okay. And so you do that. And then what
15   happens after that?
16   A. I -- I refused to sign it, and I gave it back
17   to them, and I -- I left.
18   Q. Okay. Do you go back to work?
19   A. No. I was escorted out by security.
20   Q. Okay. And what happens? Do you work any more
21   between -- what day was that meeting? November 3rd?
22   Yeah. When do you come back to work?
23   A. I -- I never did.
24   Q. That was your last day on the premises?
25   A. Uh-huh. Yes.

Page 115

1    Q. Yes? Okay.
2        When is it that you were advised that
3    your employment was being terminated?
4    A. December 22nd, 23rd.
5    Q. Okay. So between November 3rd, 2009 and
6    December 22nd, you never go back to Continental?
7    A. No.
8    Q. Okay. Isn't it true that you did have a
9    subsequent meeting?
10   A. You know, let me go back. I think I had,
11   like, three -- two to three meetings after -- I mean,
12   before I got terminated on December 22nd.
13   Q. Right. Okay. And those were all there at
14   Continental, right?
15   A. Right.
16   Q. At the airport?
17   A. Right.
18   Q. Okay. Tell me about the first meeting after
19   the November 3rd meeting, that you can recall.
20   A. I don't even remember who was in the room.
21   I apologize.
22   Q. Okay. What -- what do you recall about the
23   meeting?
24   A. They were asking me some questions, but I was
25   never provided with -- with a copy of -- of -- of the

Page 116

1    things that I -- that I was being accused of.
2    Q. And was Ms. Irene Mosqueda with you on that
3    occasion?
4    A. I know that she was -- she wasn't present in
5    two of them. I -- I -- I don't recall if she was
6    present on the second one.
7    Q. Was there ever a meeting that you met with
8    management where either -- where somebody from EIT, the
9    Employee Involvement Team, wasn't present?
10   A. They -- they were present in -- in all the
11   meetings that I -- that I had.
12   Q. Right. An EIT member was present for all
13   meetings, correct?
14   A. Right.
15   Q. All right. And so whether or not it was
16   Irene, or it could have been another woman by the name
17   of Norma --
18   A. Scott, yes.
19   Q. -- Norma Scott, somebody -- an EIT
20   representative was always present, correct?
21   A. Right.
22   Q. Okay. All right. And so the second meeting
23   that took place, you don't recall who was present for
24   that one?
25   A. No.

Page 117

1    Q. Do you recall what the purpose of that meeting
2    was?
3    A. It was -- as an employee, you get, like, three
4    -- three chances to -- to try to get your job back, and
5    I was trying to do just that.
6    Q. Okay. I'm not talking about the meetings that
7    took place after you were terminated in the appeal
8    process. We'll go over that. But I'm talking about --
9    you just said that after this November 3rd meeting and
10   before you got the letter that you were terminated --
11   what's that -- four or five weeks later, you had two or
12   three meetings in between there.
13   A. I was talking about the -- the -- that
14   process --
15   Q. Okay.
16   A. -- in trying to get my job back.
17   Q. So is it your testimony that between
18   November 3rd, 2009 and December 18 or 22, you didn't
19   have any meetings at Continental?
20   A. I -- I don't recall. Everything should be in
21   the -- in the paper.
22   Q. Okay.
23   A. I don't recall the dates.
24   Q. I'm not asking you about dates. I just want
25   to know, do you recall any meetings in between --

May 14, 2012
Elite Reporting Service, Inc.

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 118

1   A.  I don't.
2   Q.  -- the first --
3       Well, let me finish my question.
4       -- the first meeting that you had with
5   Investigations and when you were -- your employment was
6   terminated on December 18 or 22?
7   A.  I don't.
8   Q.  You don't.  And are you saying no -- no such
9   meetings happened, or you just don't recall one way or
10  the other?
11  A.  I don't recall the meetings.
12  Q.  Okay.  You just don't recall one way or the
13  other?
14  A.  I -- I don't remember.
15  Q.  Okay.  All right.  Let me show you what I'm
16  going to mark here as Exhibit No. 13 to your deposition
17  and ask you if you have ever seen this document that's
18  entitled "Statement of Findings."
19      (Exhibit No. 13 was marked.)
20  A.  Yes.  It was -- it was given to me when I was
21  terminated, I think.
22  Q.  Okay.  Well, let's look at this.  This -- this
23  is what I was referring to before.  It says, "Houston
24  Interpreter Daniel Palacios."
25      Why does it call you interpreter there;

Page 119

1   do you know?
2   A.  Because I speak Spanish.
3   Q.  Okay.  But was that an official title that you
4   had or --
5   A.  Yeah, you can say that.
6   Q.  Okay.  So "Houston Interpreter Daniel Palacios
7   was identified as having modified tickets for friends
8   without collecting the applicable fees.  An
9   investigation of Palacios' pass travel also identified
10  numerous occasions where his international Buddy Pass
11  riders traveled unaccompanied and in an incorrect pass
12  classification."
13      All right.  When -- when they met with
14  you on November 3rd, did they tell you, Hey, we're
15  coming to talk to you about these two issues?
16  A.  Right.  Can I add something to that?
17  Q.  Sure.
18  A.  The first paragraph, it says that -- that I
19  didn't collect fees for this ticket for my friend.  When
20  -- when they first asked me that question, that -- on --
21  on the first meeting, November 3rd, I think, I remember
22  that I had collected a fee.  I didn't remember what --
23  what it was for or -- or how I had collected that --
24  that -- that -- that fee, but I did remember collecting
25  a fee for this person.

Page 120

1       Apparently, they didn't have a record of
2   that, so I had to go and -- and try to find my friend
3   and get a copy of his bank credit card to show that I --
4   indeed, I had collected a fee, and which I did.  And I
5   showed it to them in one of the meetings that we had.
6   And, apparently, they didn't know anything about that.
7       But, I mean -- but the -- the fee, it was
8   -- it was in the bank statement.  And -- and after the
9   second or third meeting, Eileen -- Irene went into the
10  system and -- and saw that, indeed, I had collected that
11  fee.
12  Q.  Okay.  Well, I think you talk about all this
13  in one of your statements.
14      All right.  So this goes on to say,
15  "During an interview Palacios claimed he did not
16  remember making changes to his friend's tickets and
17  failed to give any explanation for the transactions.  He
18  did admit violating company pass policy by allowing his
19  Buddy Pass riders to travel unaccompanied to and from
20  international destinations and giving passes to people
21  he did not know."  Is that true?
22  A.  Yes.
23  Q.  Okay.  And that was against the policy to do
24  that, correct?
25  A.  Right.

Page 121

1   Q.  Okay.  Then it goes on to say, "Direct losses
2   attributed to Palacios actions are" approximated one --
3   "approximately $1,000."
4       Did anybody ever tell you how the
5   thousand-dollar figure came up?
6   A.  No.  And -- and -- and let me mention that --
7   that, you know, when this person said that I -- that I
8   didn't collect the fee, he was due a refund, too, which
9   I didn't -- I didn't -- I didn't process that because,
10  obviously, I was -- I didn't -- I didn't think about
11  that.
12  Q.  Okay.  You didn't think about it during that
13  meeting?
14  A.  I didn't think about giving him what he was
15  due back on his ticket when I changed his -- his ticket.
16  Q.  Oh, I see.  Okay.
17      Going down under "Details of the Case,"
18  still looking at Exhibit No. 13, it says, "A Data
19  Warehouse profile identified Interpreter Daniel Palacios
20  modifying several tickets for friends."
21      Do you know what a Data Warehouse profile
22  is?
23  A.  No.
24  Q.  Okay.  Do you know, Mr. Palacios, of any other
25  employees who have been investigated for modifying

May 14, 2012
Elite Reporting Service, Inc.

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 126

1    helped them out?
2    A. Yes.
3    Q. That's your testimony?
4    A. Yes.
5    Q. Okay. All right. And so besides that
6    situation, are you saying that there are other
7    situations you've heard about?
8    A. Possibly, yes.
9    Q. Possibly, but you're not sure one way or the
10   other?
11   A. Right.
12   Q. Okay. All right. And, again, on this
13   situation, it's your testimony that Norma Scott actually
14   gave a name to Steve Jaquith?
15   A. Yes, she did.
16   Q. Okay. And you were present for that?
17   A. I was – yes, I was present.
18   Q. Was anybody else present?
19   A. No. It was just us three, Steve, Norma and
20   myself.
21   Q. Okay. And when would that meeting have taken
22   place?
23   A. I want to say that it was after they gave me
24   that termination letter --
25   Q. Okay.

Page 127

1    A. – December 22nd, 23rd.
2    Q. Because under the appeal process, all the
3    meetings have a lot more people than just -- just that
4    number, right?
5    A. Not this one.
6    Q. Okay. So was this part of the appeal process,
7    or was this some other informal meeting?
8    A. I don't recall.
9    Q. Okay. All right. Still looking there at
10   Exhibit No. 13, it says, "The interview began with
11   Palacios providing written responses to questions on a
12   pre-interview questionnaire."
13        And we talked about that, right?
14   A. Right.
15   Q. That's where you wrote down "Don't know" or
16   "Friend," right?
17   A. Right.
18   Q. And it says, "Palacios was unable to identify
19   nine of his pass users. In response to the question,
20   'Have you ever violated Continental's Friends and Family
21   Policy?' Palacios circled 'No'"; is that right?
22   A. Right.
23   Q. Then when asked "Have you ever violated
24   Continental's pass policies? Palacios initially opted
25   not to answer the question, but when told an answer was

Page 128

1    required, he circled 'No'"; is that right?
2    A. Right.
3    Q. All right. And again, we're looking at
4    Exhibit No. 9. Do you see Exhibit 9 there?
5    A. Yes.
6    Q. And look at the second page. All right. Now,
7    you testified earlier that you had, in fact, violated
8    that policy, didn't you?
9    A. I said – the first thing that I said is that
10   – that I didn't remember.
11   Q. Okay. I'm asking now: Did you violate
12   Continental's pass policy?
13   A. Yes, but that was not my intention.
14   Q. Okay. And how did you violate the pass
15   policy?
16   A. By letting Buddy Passes travel without me.
17   Q. Okay. And when you're saying now that it was
18   not your intention, what was your intention?
19   A. Traveling with them.
20   Q. And so how did you intend to travel with them
21   but then you ended up not traveling with them?
22   A. That has – that has a lot to do with – with
23   my disability.
24   Q. And how many times did your disability, you
25   say, prevent you from traveling on your pass policy –

Page 129

1    or traveling with your Buddy Pass persons
2    internationally?
3    A. I was – I was accused of three, and one of
4    them I showed the receipts that I traveled with them; so
5    maybe a couple of times.
6    Q. Okay. And so when you say your disability
7    prevented you from traveling with these people
8    internationally, how did your disability prevent you
9    from traveling?
10   A. I didn't feel -- like I said before, I didn't
11   -- I didn't feel -- I didn't feel like -- like going, I
12   guess you would say.
13   Q. Okay. Was it not your responsibility,
14   Mr. Palacios, then, to tell these people, Look, these –
15   these passes require that I travel with you
16   internationally; and since I can't go, you can't go?
17   A. Right.
18   Q. That was your responsibility?
19   A. Right.
20   Q. But you didn't do that?
21   A. No.
22   Q. Okay. It goes on to say, "Palacios was
23   questioned regarding a ticket for his son's girlfriend
24   that he changed without collecting the associated fees
25   or required additional collection. He initially denied

May 14, 2012
Elite Reporting Service, Inc.

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

## Page 130

1  that he knew the customer and only admitted it was his
2  son's girlfriend when questioned further."
3      Did that happen?
4      A.  That happened.  I want to mention that -- that
5  I had only met her once.  And I have a disability that
6  -- that it's hard for me to recollect names and -- and
7  -- and -- and things that happen.
8      Q.  Okay.  But, in any event, it is true that you
9  changed the -- the ticket without collecting the fee,
10 correct?
11     A.  Yes.
12     Q.  And my understanding is, you're saying you
13 didn't collect the fee because your son had some kind of
14 military issue, he had to travel for the military; and
15 so, therefore, you changed the girlfriend's fee --
16     A.  Correct.
17     Q.  -- or ticket, too, right?
18     A.  I want to mention that -- that -- that we do
19 have -- working at the airport, we -- we are free to --
20 to change tickets without requesting any kind of
21 paperwork.  If -- if a family member is sick, we -- we
22 are allowed to -- to make changes on those tickets.
23     Q.  Where does it say that in the Friends and
24 Family Policy?
25     A.  It -- it's for customers.

## Page 131

1      Q.  Okay.  I'm talking about the Friends and
2  Family Policy.  This is a Friends and Family situation,
3  isn't it?
4      A.  Yes, it is.
5      Q.  And doesn't the Friends and Family Policy
6  specifically and expressly say that you are not allowed
7  to change a ticket for a friend or family member?
8      A.  Unless you get a management -- member of
9  management to okay it, right.
10     Q.  Right.  And you did not do that with respect
11 to your son's girlfriend, did you?
12     A.  I was too busy working a flight, and I didn't
13 think about it.
14     Q.  Okay.  But the question is:  Did you get
15 management approval for your son's girlfriend's ticket?
16     A.  No, I did not.
17     Q.  Okay.  And so, therefore, that would violate
18 that policy, correct?
19     A.  Correct.
20     Q.  Okay.  It goes on to say, "Palacios was
21 questioned about changes made on tickets for two
22 friends, and again he claimed that he couldn't remember
23 anything about the transactions.  When advised the fees
24 on the tickets was over 200 each, he changed his story
25 and claimed he had collected the penalty."

## Page 132

1      Do you recall that situation?
2      A.  That's when I said that I collected something,
3  and -- and I wasn't able to prove anything at that time,
4  but I came back with receipts.
5      Q.  Okay.  And it goes on to say, "Palacios was
6  shown documentation in the reservations" -- "in the
7  reservations that authorized a fee waiver due to Swine
8  Flu; he defended the action by stating 'We have all
9  sorts of waivers.'  Palacios was asked how he collected
10 the penalty, and he claimed that he took a credit card
11 over the phone.  When told the company records show no
12 indication that the penalties were collected, Palacios
13 changed his story again, stating 'If it's not in the
14 record, then it wasn't collected.'"
15     Did that happen?
16     A.  Right.  I was -- I was being accused of not
17 collecting a fee, which I did.  And -- and I said, You
18 know what?  If it's not in the record -- record, then I
19 didn't.  But I came back and I did that.  I collected a
20 fee.
21     Q.  Okay.  Next they say that, "Palacios was asked
22 why he failed to identify nine of his pass users listed
23 on the pre-interview questionnaire.  He initially stated
24 that their names 'did not ring a bell' and eventually
25 admitted that his travel companion gave his passes to

## Page 133

1  people he did not personally know."
2      A.  Right.
3      Q.  Did that happen?
4      A.  Yes.
5      Q.  When you say your travel companion, who is
6  your travel companion?
7      A.  It was Jose Josuelazo.
8      Q.  Can you spell that name for us?
9      A.  J-O-S-U-E-L-A-Z-O.
10     Q.  Okay.  And -- and explain that to me.  Who is
11 a travel companion?  I don't understand how that works.
12     A.  Since I -- I was divorced at the time, you're
13 allowed to -- to -- to have a companion to -- that can
14 travel under your wife's benefits if -- if you don't --
15 if you don't have one.
16     Q.  I see.  Okay.  All right.  And so on those
17 nine passes there, Mr. -- I won't try to say his name,
18 Jose --
19     A.  Huh-uh.
20     Q.  -- actually used them and gave them to other
21 people; is that right?
22     A.  Right.
23     Q.  Okay.  And then it says, "Palacios admitted he
24 violated company pass policy when he gave his passes to
25 third parties"; is that right?

34

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

## Page 134

1    A.  Right.

2    Q.  And you admit that's a violation?

3    A.  Right.

4    Q.  Okay.  "Palacios was confronted with the fact

5  that 18 of his Buddy Passes were used to travel

6  unaccompanied on international flights.  He admitted he

7  knew unaccompanied international travel was not allowed

8  but claimed it only happened once."

9         Now, this is saying 18.  I thought you

10  said there were only three -- three times where that

11  happened.

12    A.  That's 18, because I went with -- with the

13  family to -- to Columbia.  And -- and they count as one

14  person, as -- as one instance.  And -- and -- and on one

15  of them I was able to prove that, indeed, I -- I did

16  travel with them from Columbia to Houston; and then I

17  forgot to change the pass classification from -- from

18  Houston to Dallas, and that was six of them.

19    Q.  Okay.  So what about the other 12, then?  This

20  talks about 18.

21    A.  I don't see 18 names on this list.

22    Q.  Well, this is talking about Buddy Passes being

23  used for international travel.

24    A.  Again, I was never provided -- provided a copy

25  saying that, you know, they're talking about 18

## Page 135

1  instances or 18 -- 18 -- 18 different people, and -- and

2  I only see 17 here.

3    Q.  Okay.  It goes on to say, "Upon further

4  questioning, Palacios recanted his previous answer and

5  admitted that his Buddy Pass users traveled

6  unaccompanied on international travel more than once."

7         Did you admit that?

8    A.  I did.

9    Q.  And why did you admit it?  I mean, is that

10  true?

11    A.  Possibly, yeah.  If I -- if -- if it says that

12  I admitted it, then I -- I probably did.

13    Q.  It goes on to say, "He admitted that he

14  knowingly let his pass users travel alone and in some

15  cases never planned to travel with them."

16         Did you tell them that, that there were

17  some times where you never planned to travel with them?

18    A.  There were times that I -- I didn't -- I

19  didn't pay attention to what I was doing, and I didn't

20  -- I guess I didn't plan to travel with them.

21    Q.  So that's true?

22    A.  Yes.

23    Q.  All right.  And then it goes on to say,

24  "Company records indicate Palacios listed the Buddy Pass

25  riders as if they would" -- "would be accompanied --

## Page 136

1  "as if they would be accompanied, which resulted in a

2  higher pass classification (SA4) than was applicable and

3  which hid the fact that the traveler was a buddy

4  traveling alone."

5    A.  I don't think that I ever admitted to that,

6  and they never gave me a copy of those records.  They

7  just said that -- that I have done that, but I was never

8  provided with a copy of that.

9    Q.  Okay.  But are you saying that you did not do

10  that?

11    A.  I'm saying that -- that I don't recall doing

12  that.

13    Q.  Okay.  So why did you admit that you did it?

14    A.  I guess because I was under pressure.

15    Q.  It says, "Palacios admitted his actions were a

16  violation of company pass policy, created a conflict of

17  interest and were unfair to other pass riders."

18         If you had done that, would you agree

19  that that would be a violation of company policy?

20    A.  Correct.

21    Q.  And it would create a conflict of interest?

22    A.  Correct.

23    Q.  And unfair to the other pass riders?

24    A.  Correct.

25    Q.  And so as far as that statement of findings,

## Page 137

1  you admit that you were provided with one of those

2  throughout the appeal process or at some time during the

3  appeal process?

4    A.  I was provided with what?  I'm sorry.

5    Q.  Exhibit No. 13.

6    A.  A copy like this?

7    Q.  Yes.

8    A.  No -- no, because this was given to me at the

9  end.  I was provided with a copy of Exhibit No. 9.

10    Q.  Okay.  Right.  I know No. 9.

11         But Exhibit No. 13, is it your testimony

12  that today is the first time you saw Exhibit No. 13?

13    A.  I saw it when they gave it to me when I was

14  terminated in December 22nd or 23rd.

15    Q.  Okay.  So you did receive it; is that right?

16    A.  Right.

17    Q.  Okay.  I just want to be clear on something.

18  In between November 3rd -- that's the meeting with the

19  Corporate Investigations team -- and December 22nd, when

20  you were terminated, you can't recall any specific

21  meetings that took place during that period of time?

22    A.  I don't.

23    Q.  Okay.  But you do recall that you did meet

24  with people sometime during that period?

25    A.  I'm probably mistaken, the -- the meetings

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 138

1  that I had to -- to try to get my job back.
2  Q. I'm sorry. I didn't understand you.
3  A. I'm -- I'm probably mistaken on the dates that
4  I met in -- in the process to get my job back. And I
5  don't know if it's -- if it happened before December
6  22nd or after.
7  Q. Okay. And again, we're about to go over the
8  whole three-step appeal that you went through. But I
9  just want to know if between the date that you had that
10  first meeting where they asked you all the questions and
11  before you were terminated -- so you've got a five-week
12  period of time there where you're off of work, correct?
13  A. Right.
14  Q. Are you being paid during that five-week
15  period of time?
16  A. I think I was being paid before December 22nd.
17  After that, I was not.
18  Q. Right. Yeah, and I -- I think so, too.
19  Between November 3rd and December 22nd, you were being
20  paid.
21  But -- but while you were off that
22  five-week period of time, do you recall going back in to
23  the office, setting up meetings to talk to people, Hey,
24  I want to provide you with this additional information?
25  A. I did, but -- but it made it kind of hard

Page 139

1  because I was -- it was the holiday season, and -- and
2  as -- I was trying to get letters from -- from the
3  person who suffered the Swine Flu in -- in Florida. It
4  made it hard -- it also made it hard to contact
5  Mr. Gearing because he was also on vacation. And I left
6  -- and I left several voicemails, he -- and he never
7  responded.
8  Q. Right. But -- but you did receive different
9  documentation from the Swine Flu lady, from the other
10  person with the credit card. You got all that prior to
11  your termination, right?
12  A. Right.
13  Q. And you had at least two meetings, I think it
14  is, where you brought information in to people at
15  Continental to say, Look, I got this information; I
16  wanted to bring this in for you to see it, right?
17  A. They were not really meetings. I remember one
18  day that -- that I called. I don't know if it matters
19  or not. I called Malcolm Gearing, and he met me at the
20  -- at the -- at the curb where you would drop off
21  customers. And I just drove by and gave him a folder
22  with documents.
23  Q. Okay. And do you recall what those documents
24  were?
25  A. It was, I want to say, banking statements and

Page 140

1  a letter from Swine Flu. That's probably it. That's
2  what I can remember.
3  Q. Okay.
4  (Exhibit No. 14 was marked.)
5  Q. Let me show you what I'm marking here as
6  Exhibit No. 14 to your deposition and ask you if this is
7  the termination letter that you've been referring to.
8  A. Yes.
9  Q. And let me make the right -- the reference
10  here. There is underlining and circling on the page.
11  I'm not sure who did that. It's not mine. It's the
12  only copy I could find in the file. Somebody wrote on
13  it.
14  Do you know -- did you write -- did you
15  do the underlining on here?
16  A. I don't remember.
17  Q. Okay. I'm not sure where it came from.
18  If you look at the second page of the
19  letter, this shows that Exhibit No. 14 is signed by
20  Malcolm Gearing. Do you see that?
21  A. Right.
22  Q. And then it says, "Administered 12-21-2009 by
23  Charlette Norfleet." Do you see that?
24  A. Right.
25  Q. Also, there's a signature by Irene Mosqueda

Page 141

1  and yourself; is that right?
2  A. Right.
3  Q. All right. And is that, in fact, your
4  signature there?
5  A. It is my signature.
6  Q. Okay. And if you'll turn back to the very
7  first page. The date at the top originally said
8  December 18th. That's crossed out and then the number
9  21, for December 21, is on there, correct?
10  A. Right.
11  Q. Okay. And can you read what's next to that,
12  what that says?
13  A. Next to what?
14  Q. December 18, 21, 2009?
15  A. That's -- I don't know.
16  Q. I cannot read what that says. I've tried for
17  the life of me.
18  A. Oh, that was Norfleet. I guess that's her
19  initials saying that --
20  Q. Oh --
21  A. -- that she changed the date.
22  Q. -- C. Norfleet. Oh, I see. Oh, thank you
23  very much. I've been looking at that document forever
24  and not able to understand what it was saying.
25  Okay. So it looks like C. Norfleet

May 14, 2012
Elite Reporting Service, Inc.

ORAL AND /IDEOTAPED DEPOSITION OF
DANIEL PALACIOS

## Page 146

1        (Exhibit No. 16 was marked.)
2        Q.  Let me show you what I'm marking here as
3   Exhibit No. 16 and ask you if you recall this fax.
4        A.  Yes.
5        Q.  Okay.  This shows to be a fax from yourself to
6   Karen Rodarmel, who is the HR lady we talked about
7   before.  And it says cc to Steve Jaquith on it.  And
8   this says that this is a request for appeal form.
9        A.  Right.
10       Q.  Is that correct?
11       A.  Yes.
12       Q.  All right.  All the handwritten language on
13  there, is that your handwriting?
14       A.  Yes, it is.
15       Q.  Okay.  And if you look down at the bottom of
16  this page, it says, "I will ask EIT Representative" --
17  and you wrote in there "Norma Scott/Irene Mosqueda" --
18  "to assist me at the appeal."
19       A.  Correct.
20       Q.  Okay.  As far as you can recall, is the first
21  time you got Norma Scott involved here when you were
22  doing this appeal?
23       A.  Yes.
24       Q.  Okay.  And looking at what you wrote, it says,
25  "Company Policy was applied inappropriately."  You write

## Page 147

1   "Yes"; is that right?
2        A.  Right.
3        Q.  And then it says, "Explain."  And you wrote,
4   "I was not presented with copies of records or PNRs at
5   the time of questioning."
6        A.  Correct.
7        Q.  What are PNRs?
8        A.  Passenger name records.  It's -- it's a copy
9   of your -- a record when -- when you call and -- and --
10  and book -- book a flight.  It has all -- all your
11  information.
12       Q.  It has all the customers' information on it?
13       A.  Right.
14       Q.  Okay.  And you were asking for copies of the
15  customers' records?
16       A.  Right.
17       Q.  All right.  And who did you ask that from?
18       A.  Corporate Security.
19       Q.  And how did they respond to that?
20       A.  They said that they were not allowed or -- or
21  our policy says that I was not able to get those --
22  those copies of -- of the records.
23       Q.  And did they explain that there was
24  confidential information with the passengers' credit
25  card information and home address and that stuff on it?

## Page 148

1        A.  I don't recall that.
2        Q.  Okay.  Well, based on your 20 years working
3   there, does the PNR contain that information?
4        A.  Yeah, it has the credit card information.
5        Q.  Would it also contain their address on it?
6        A.  Yes.
7        Q.  Okay.  This goes on to say, "The disciplinary
8   action taken was inappropriate or excessive."  And you
9   write "Yes"; is that right?
10       A.  Right.
11       Q.  And then when they ask you to explain, you
12  write, "Action was severe based on present illness,
13  exemplary track record and unblemished work and service
14  performance record"; is that right?
15       A.  Right.
16       Q.  Okay.  And now, at least in terms of anything
17  in writing, are you aware of any written documentation
18  prior to this one where you mention any kind of illness,
19  in connection with your termination from employment?
20       A.  What do you mean by that?
21       Q.  Well, this document here refers to a, quote,
22  "present illness."  Do you know of any other
23  documentation that you turned in to the company prior to
24  this and -- regarding your termination where you talk
25  about having any kind of illness?

## Page 149

1        A.  It was based -- based on -- on my -- my
2   depression.  And I turned in, you know, a lot of
3   paperwork in to -- in to management, Resources.
4        Q.  Okay.  Yeah.  And when -- when you turned in
5   that paperwork -- let -- let me be clear on that, too.
6   We talked about the six people, including yourself, who
7   were at the -- your Corporate Security investigation
8   meeting.  Do you have any evidence at all suggesting
9   that any of those people would have known anything about
10  your -- either your FMLA leave or your depression?
11       A.  I have copies of -- of every -- or of the --
12  my FMLA -- FMLA paperwork that I've submitted.  They
13  should have known that.
14       Q.  Why -- why should they have known that?
15       A.  Because they're members of management.
16       Q.  Okay.  So it's your understanding that every
17  member of management is going to know about everybody
18  there's FMLA paperwork?
19       A.  Yes.
20       Q.  That's what you believe?
21       A.  Yes.  And -- and -- and when they sit down to
22  do their staffing, their paperwork, it gives you names,
23  their shifts, their employee numbers, and it tells you
24  whether -- whether -- if they're on vacation, FMLA, sick
25  time, one, two, three days.

38

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 158

1  management to be able to do that in Corporate Security
2  or –
3      A.  Corporate Security is management.
4      Q.  All Corporate Security is management?
5      A.  Right.
6      Q.  So it's your testimony that Mr. Richard
7  Stepanski was management?
8      A.  Right.
9      Q.  Okay.  And Elizabeth Condon, his boss, what
10  was she?
11     A.  I – I have no idea.
12     Q.  Did you know that Elizabeth Condon was
13  Mr. Stepanski's boss?
14     A.  No.
15     Q.  Okay.  Do you know how long Mr. Stepanski had
16  been in Corporate Security?
17     A.  No.
18     Q.  Do you know whether or not this was his very
19  first investigation in Corporate Security?
20     A.  No.
21     Q.  But you do know that he had access to your
22  files?
23     A.  Right.
24     Q.  Okay.  So all these things you don't know
25  about him, but one thing you do know is that he had

Page 159

1  access to your files?
2      A.  Right.
3      Q.  Okay.  We understand.
4          MR. MITCHELL:  We can take a break.
5          THE VIDEOGRAPHER:  This is the end of
6  Tape 3.  We'll proceed on to Tape 4.  The time is
7  approximately 12:52 p.m.
8          (Lunch recess.)
9          THE VIDEOGRAPHER:  This is the beginning
10  of Tape 4.  The time is approximately 1:43 p.m.
11     Q.  (By Mr. Mitchell)  Mr. Palacios, you
12  understand you're still under oath?
13     A.  Yes.
14     Q.  I want to go back.  If you'll pull out Exhibit
15  No. 11 over there.  That's your EEOC charge.  I'm
16  noticing on the first page, it looks like you signed
17  that thing on -- does that say January 11, 2010?
18     A.  Right.
19     Q.  And then at the top or over on -- on the
20  middle of the right-hand side, it shows that the EEOC
21  got it August 3rd, 2010.  Do you see that?
22     A.  Yes.
23     Q.  Do you know what -- why there was a gap of
24  about seven months in there between when you signed it
25  and when it got sent to the EEOC?

Page 160

1      A.  Because my previous attorney didn't do his –
2  his job.
3      Q.  Okay.  And that attorney, at the top it shows
4  Rosenberg & Sprovach?
5      A.  Yes.
6      Q.  You were represented by Greg Rosenberg
7  at the time?
8      A.  Yes.
9      Q.  Okay.  Let me also ask you, on the second page
10  over there, on the very last paragraph it says, "I
11  believe I have been discriminated against in violation
12  of Title VII of the Civil Rights Act of 1964" – then it
13  has some numbers – "as well as in violation of
14  Section 21 of the Texas Labor Code."  Do you see that?
15     A.  Right.
16     Q.  Okay.  Is this the only EEOC charge that
17  you've filed against Continental?
18     A.  Yes.
19     Q.  Did you ever file an EEOC charge that
20  references the Americans for Disabilities Act?
21     A.  Before that.
22     Q.  I'm sorry?
23     A.  No, not before it.
24     Q.  Did you at any time?
25     A.  No.

Page 161

1      Q.  Okay.  And I understand in your lawsuit you're
2  suing for alleged disability discrimination; is that
3  right?
4      A.  Correct.
5      Q.  Okay.  And we were talking before about the
6  disability that you say you have or had or whatever.  As
7  I understand it, it's severe depression?
8      A.  Correct.
9      Q.  Okay.  Is it your testimony, Mr. Palacios,
10  that your depression made you commit those policy
11  violations that we talked about before?
12     A.  Correct.
13     Q.  It is?
14     A.  Yes.
15     Q.  And – and how did the depression make you
16  commit those policy violations?
17     A.  Well, the depression that I have is deep
18  depression, and I tend to forget things.
19     Q.  And so are you saying that you forgot the
20  rules when you committed those viola – policy
21  violations?
22     A.  Yes.
23     Q.  Okay.  And is there anybody in particular –
24  we talked before about the six people or the five people
25  who were in the initial investigation meeting with you,

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

## Page 162

1  that being Irene, Karen Rodarmel, Elizabeth Condon,
2  Richard Stepanski, and Malcolm Gearing, correct?
3      A.  Correct.
4      Q.  All right.  During that meeting, that initial
5  meeting, I understand that you believe that Irene said
6  something to Karen about you having a disability; is
7  that right?
8      A.  Correct.
9      Q.  But you didn't hear what she said?
10     A.  Correct.
11     Q.  Okay.  Did anybody -- did you ever hear
12  anybody bring up any kind of disability that you're
13  claiming to have in this lawsuit?
14     A.  No.
15     Q.  Okay.  And, in fact, your testimony is you
16  didn't even hear Irene say that to Karen; you just think
17  that she did?
18     A.  I know that she did because she told me after
19  -- after the meeting that she had done that.
20     Q.  Okay.  But you didn't hear it?
21     A.  Right.
22     Q.  Okay.  And I understand that there was a
23  meeting that happened after this investigation meeting
24  that was attended by yourself, Karen, Malcolm, and
25  Irene.  Do you recall that meeting, just the four of

## Page 163

1  you?
2      A.  Correct.
3      Q.  Okay.  And where did that meeting take place?
4      A.  One of the offices at the airport.
5      Q.  Okay.  And do you recall what happened during
6  that meeting?
7      A.  No, I don't.
8      Q.  Okay.  Could it be, in fact, that it was at
9  that meeting where you and Irene raised the issue of you
10  having a disability?
11     A.  Possibly.
12     Q.  Okay.  And would that be in addition to the
13  original investigation meeting, or is that the first
14  time that it happened?
15     A.  I -- I don't recall.  It -- it could have been
16  the -- the first time that he brought it up to -- to
17  them, or it was in addition to -- to the first time.
18     Q.  You just don't know one way or the other?
19     A.  Correct.
20     Q.  And when you say "he," did you mean "she," the
21  first time "she"?
22     A.  Right, "she."
23     Q.  All right.  In terms of this disability that
24  you claim to have that made you commit these types of
25  policy violations, do you believe that somebody was

## Page 164

1  wanting to discriminate against you because of that
2  disability?
3      A.  I believe that -- that when I disclosed it in
4  that -- that when I said in the first interview that I
5  needed to be accommodated, that that didn't happen.
6      Q.  Okay.  And how did you need to be
7  accommodated?
8      A.  Just by asking to give me time and -- and when
9  I asked for a pen and paper.
10     Q.  Okay.  Well, you got the pen and paper
11  10 minutes into the meeting, right?
12     A.  Right.
13     Q.  Okay.  And so are you complaining about -- in
14  terms of your disability discrimination claim, is it
15  that you weren't accommodated during that meeting to
16  give you more time to think about your answers?
17     A.  Correct.  And -- and -- and not only that, but
18  I asked for -- to see the records that -- apparently
19  that I was accused of, and I was never provided with a
20  copy of the records.
21     Q.  So is that the basis of your disability claim,
22  that you just wanted some additional stuff during that
23  initial meeting?
24     A.  Correct.  And because I tend to forget things,
25  and -- and -- and it's hard for me to concentrate --

## Page 165

1      Q.  Okay.
2      A.  -- especially when I have six people asking me
3  questions left and right.
4      Q.  Okay.  And let's talk about that.  Was Irene
5  asking you questions?
6      A.  No, Irene was not.
7      Q.  Did Karen Rodarmel ask you any questions?
8      A.  Yes.
9      Q.  Did Malcolm Gearing ask you questions?
10     A.  Yes.
11     Q.  Did Richard Stepanski ask you questions?
12     A.  Yes.
13     Q.  Did Elizabeth Condon ask you questions?
14     A.  Yes.
15     Q.  And so it's your testimony that everybody
16  except for Irene in that meeting was asking you
17  questions?
18     A.  Correct.
19     Q.  Okay.  It wasn't just Richard Stepanski who
20  was asking you questions?
21     A.  No.
22     Q.  And if those people all say that Richard was
23  the only person who asked questions, they would all be
24  being untruthful.  Is that what you're saying?
25     A.  I don't recall that, but I recall them asking

May 14, 2012
Elite Reporting Service, Inc.

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 166

1  me questions.
2      Q.  And you recall all four of those people asking
3  you questions?
4      A.  They were asking questions and — and making
5  comments.
6      Q.  Okay.  Well, no, I'm asking about asking
7  questions.  Who was asking you questions during the
8  meeting?
9      A.  All five.
10     Q.  Including Irene?
11     A.  Not — Irene would be the sixth person,
12  correct?
13     Q.  No.  Irene is six — you're number six.  So
14  you're saying Irene, Karen, Elizabeth —
15     A.  I apologize.  No.  Irene was — actually,
16  Irene was not allowed to talk.
17     Q.  Okay.  I thought you said Irene came in and —
18  and told Karen that you had a disability.
19     A.  Right after we — we came back from — from a
20  little break that we took, that's the first thing and
21  only thing that she said.
22     Q.  Okay.  But you didn't hear what she said?
23     A.  No.
24     Q.  Okay.  But, again, Karen, the HR lady, asked
25  you questions?

Page 167

1      A.  Right.
2      Q.  What did she ask you?
3      A.  I don't recall.
4      Q.  Okay.  Elizabeth Condon, she asked you
5  questions?
6      A.  Right.
7      Q.  What did she ask you?
8      A.  It had to do with the question that -- that I
9  was being asked about violating the Friends and Family
10  policies.
11     Q.  Okay.  Richard Stepanski, what did he ask you?
12     A.  Same questions.
13     Q.  Okay.  And then Malcolm Gearing, what did he
14  ask you?
15     A.  Exactly the same thing, too.
16     Q.  Okay.  Now, I understood from your testimony
17  earlier that you said that Malcolm was sneering at you
18  and giving you looks.  And now you're saying he was
19  asking you questions, too?
20     A.  Right.
21     Q.  Okay.  And again, so that I'm clear, as far as
22  this disability discrimination claim, you're not saying
23  that they fired you because you have a disability;
24  you're just saying that they didn't give you the
25  accommodations you needed during that meeting?

Page 168

1      A.  I'm saying that — that my termination is
2  doubtful because as soon as I came back from — from
3  FMLA, like, a month and a half, two months, that's when
4  I was — well, when — when they called me in for the
5  interview.
6      Q.  Okay.  But my question is:  Are you saying
7  that you were fired because of some kind of disability?
8      A.  Part of it, I guess.
9      Q.  Part of it?
10     A.  Yes.
11     Q.  Okay.  What part of it?
12     A.  I can't answer that right now.
13     Q.  Okay.  You also just raised this issue about
14  having gone on an FMLA leave, correct?
15     A.  Correct.
16     Q.  Is there — did your FMLA leave ever come up
17  at any time during that investigation meeting with
18  Corporate Security?
19     A.  It was not brought up.
20     Q.  Okay.  By anybody?
21     A.  By anybody.
22     Q.  Okay.  And do you have any information to lead
23  you to believe that anybody knew anything about your
24  FMLA leave?
25     A.  They knew about my leave and about all the

Page 169

1  times that — that I — that I was going to seek help
2  from — from EAP.
3      Q.  And again, that's just you, again, just
4  speculating based on, you believe, because they were
5  management, they had to have known about it?
6      A.  They had access to it.
7      Q.  Because you believe they had access to it?
8      A.  Correct.
9      Q.  Okay.  Not like anybody brought it up to you
10  at all, correct?  Nobody said anything about your having
11  taken leave before?
12     A.  No.
13     Q.  Okay.  All right.  And so we had the invest —
14  the original investigation meeting.  Then there's a
15  subsequent meeting that I show between yourself, Malcolm
16  Gearing, Irene, and Karen Rodarmel.  Do you recall any
17  other meetings prior to receiving your termination
18  letter?
19     A.  No, I don't.
20     Q.  Okay.  Then we talked about the termination
21  letter that you received there, which is Exhibit No. 15,
22  correct?
23     A.  Yes.
24     Q.  No.  Exhibit No. 15 is your — your rebuttal
25  letter.  It looks like your termination letter is

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 225

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DANIEL PALACIOS                    )
                                   )
VS.                                )  CIVIL ACTION NO.
                                   )     4:11-CV-03085
CONTINENTAL AIRLINES, INC.         )

REPORTER'S CERTIFICATION TO THE
DEPOSITION OF DANIEL PALACIOS
TAKEN ON MAY 14, 2012

I, MYLINDA TUBBS FAIRCLOTH, Certified Shorthand

Reporter in and for the State of Texas, hereby certify

to the following:

That the witness, DANIEL PALACIOS was duly sworn by

the officer and that the transcript of the oral

deposition is a true record of the testimony given by

the witness.

That the deposition transcript was made available

on May 22, 2012 to the witness or to the attorney for

the witness for examination, signature, and return to

Elite Reporting Service, Inc., by June 24, 2012.

That pursuant to information given to the

deposition officer at the time said testimony was taken,

the following includes all parties of record:

Mr. Peter Costea, Attorney for Plaintiff;

Mr. Michael D. Mitchell, Attorney for Defendant.

I further certify that I am neither counsel for,

related to, nor employed by any of the parties in the

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL PALACIOS

Page 226

1    action in which this proceeding was taken, and further

2    that I am not financially or otherwise interested in the

3    outcome of this action.

4        Further certification requirements will be

5    certified to after they have occurred.

6        Sworn to by me this _21st_ day of May, 2012.

7

8

9    MELINDA KURT FAIRCLOTH, CSR
     Certification No. 2896
10   Expiration Date: 12-31-12

11   ELITE REPORTING SERVICE, INC.
     Registration No. 75
12   5090 Richmond Avenue, #500
     Houston, Texas 77056
13   (713) 623-4404
     Fax (832) 519-2011

14

15

16

17

18

19

20

21

22

23

24

25